PEOPLE *v.* BLOSS

1. CONSTITUTIONAL LAW—OBSCENITY—STATUTE—VAGUENESS.
   Statute creating the crime of obscenity is not void for vagueness
   even though it did not define obscenity, because, by the
   tradition of the common law, difficult-to-define concepts, like
   obscenity, are left to the courts to be delineated on a case-
   by-case basis (MCLA § 750.343a).

2. CONSTITUTIONAL LAW—FREE SPEECH—FREE PRESS—OBSCENITY.
   Obscenity is utterance which is not within the area of protected
   speech and press (US Const, Ams 2 and 4).

3. CRIMINAL LAW—OBSCENITY—DUTY TO DEFINE—STATE PROSECU-
   TION.
   The primary obligation to define obscenity in a state prosecu-
   tion rests with the state, either through its legislature or
   its courts; the only function of the United States Supreme
   Court is to determine whether that definition is, in the cir-
   cumstances of the particular case, consistent with the de-
   fendant's right to due process and free speech.

REFERENCES FOR POINTS IN HEADNOTES
[1–22] Modern concept of obscenity.  5 ALR3d 1158.
[1]  50 Am Jur 2d, Lewdness, Indecency, and Obscenity § 11.
[2]  50 Am Jur 2d, Lewdness, Indecency, and Obscenity § 3.
[2–4, 15, 16, 22] Constitutionality of federal and state regulation
   of obscene literature—federal cases.  4 L Ed 2d 1821.
[3–6, 13, 19] 50 Am Jur 2d, Lewdness, Indecency, and Obscenity § 5.
[7]  50 Am Jur 2d, Lewdness, Indecency, and Obscenity § 15.
[8]  50 Am Jur 2d, Lewdness, Indecency, and Obscenity § 40.
[9]  50 Am Jur 2d, Lewdness, Indecency, and Obscenity § 35.
[10]  50 Am Jur 2d, Lewdness, Indecency, and Obscenity § 7.
[11]  50 Am Jur 2d, Lewdness, Indecency, and Obscenity § 6.
[12]  50 Am Jur 2d, Lewdness, Indecency, and Obscenity §§ 6, 8.
[14]  50 Am Jur 2d, Lewdness, Indecency, and Obscenity § 4.
[15]  50 Am Jur 2d, Lewdness, Indecency, and Obscenity §§ 8, 21.
[16]  50 Am Jur 2d, Lewdness, Indecency, and Obscenity § 21.
[17]  50 Am Jur 2d, Lewdness, Indecency, and Obscenity § 8.
[18, 20] 50 Am Jur 2d, Lewdness, Indecency, and Obscenity §§ 4, 7.
[21]  50 Am Jur 2d, Lewdness, Indecency, and Obscenity §§ 34–38.
[22]  50 Am Jur 2d, Lewdness, Indecency, and Obscenity §§ 3–8.

4. CONSTITUTIONAL LAW—OBSCENITY—STATE DEFINITION—FEDERAL COURTS—ROLE.

A Federal court must accept a state's definition of obscenity and the Federal court's sole function is to determine whether the state statute defining obscenity treads upon any legitimate constitutional interest of the defendant on trial.

5. CRIMINAL LAW—OBSCENITY—TRIAL—CENTRAL ISSUE—RIGHT TO PUBLISH.

The right of the defendant to publish, not the right of the materials to be published, is the central issue in a prosecution for publishing obscene materials; the nature of the material is relevant only as an attribute of the defendant's conduct.

6. CONSTITUTIONAL LAW—OBSCENITY—BINDING LAW—ABSENCE.

The United States Supreme Court has not yet devised a rule of law in the area of obscenity approved by a majority of the justices so that it could be considered a rule binding upon all lower Federal and state courts; the individual view of the justices cannot be relied upon as *stare decisis*.

7. CRIMINAL LAW—OBSCENITY—TEST.

The test to determine the right of free speech of a defendant in an obscenity trial is: given that the published material is obscene within the meaning of a state statute, not void for vagueness, the publisher of the material loses any claim to protection under the 1st and 14th Amendments if his primary intent in publishing the material was to appeal to the recipient's prurient interest in sex.

8. CRIMINAL LAW—OBSCENITY—SPECIFIC INTENT—QUESTION OF FACT.

The specific intent of a defendant, charged with a violation of the state's obscenity statute, to have had, as his primary intent in publishing the alleged obscene material, an appeal to the recipient's prurient interest in sex is a question of fact.

9. CRIMINAL LAW—OBSCENITY—SPECIFIC INTENT—PROOF.

The specific intent of a defendant charged with a violation of the obscenity statute need not be proven directly but can be inferred from his conduct, the nature of the material published, and the setting in which the material was published.

10. CRIMINAL LAW—OBSCENITY—PANDERING—SPECIFIC INTENT.

Pandering, by itself, is not enough to transform material outside the definition of the obscenity statute into obscene material; however, pandering, of itself, is sufficient to sustain

a jury finding that the defendant's primary purpose in publishing the material was to appeal to the prurient interest of the readers.

11. CRIMINAL LAW—OBSCENITY—SPECIFIC INTENT—PROOF.

Factors which could be presented to a jury as bearing on whether a defendant's primary intent in publishing alleged obscene material was to appeal to the reader's prurient interest in sex include: (1) many pictures which tend to emphasize the genitalia by the posings of the subjects; (2) accompanying text which is totally unrelated to the photographs or which is replete with double-meaning sentences and phrases; (3) pictorial stripteases which emphasize repetitiously the reproductive organs; (4) the high price of the material considering the quality of the printing or the writing and its literary worth or artistic value.

12. CRIMINAL LAW—OBSCENITY—SPECIFIC INTENT—SETTING OF PUBLICATION.

The setting in which material is published is relevant to whether defendant's primary intent in selling the material was to appeal to the prurient interest of the reader; a medical text book minutely describing in words and photographs the reproductive organs of a man and woman or a manual of sexual technique designed for the use of married couples or marriage counselors and psychiatrists would not be obscene if sold to assist them in their work, but if such material was commercially exploited to the general public, a jury, under appropriate instructions and with sufficient evidence, could find that the seller of the material intended to appeal to the prurient interest of the buyers.

13. COURTS—FEDERAL COURTS—STATE COURTS—STARE DECISIS—CONSTITUTIONAL LAW.

Decisions of lower Federal courts in the area of Federal constitutional law are normally accorded great weight in state courts.

14. CRIMINAL LAW—OBSCENITY—REDEEMING SOCIAL VALUE.

Material does not have to be utterly without redeeming social value to be obscene.

15. CONSTITUTIONAL LAW—FREE SPEECH—OBSCENITY—PRURIENT INTEREST.

Punishing a publisher for the publication of books and pictures where the primary purpose of the publisher is to appeal to

the prurient interest of the recipient is not forbidden by either the First or Fourteenth Amendments to the Constitution (US Const, Ams 1 and 14).

16. CONSTITUTIONAL LAW—FREE SPEECH—BOOKS AND MAGAZINES—STATE CONTROL.

The constitution does not place books and magazines beyond the control of the state (US Const, Ams 1 and 14).

17. CRIMINAL LAW—OBSCENITY.

Obscenity statute punishes the intention of the defendant to provoke prurient thoughts in the reader and the defendant's exploitation of the provocative nature of the material; the statute does not punish the prurient thoughts provoked by the material (MCLA § 750.343a.)

18. OBSCENITY—COMMUNITY CONSCIENCE—STANDARD—STATUTE.

"The standards of common conscience of the community" used in determining whether material is obscene refers to the standards of the local community, not a national standard (MCLA § 750.343b).

19. CONSTITUTIONAL LAW—OBSCENITY—STATE'S RIGHT.

A state has the right to determine how permissive it shall be in the area of publications which, designed to appeal to the prurient interest of the recipient, are outside the protection of the First Amendment (US Const, Am 1).

20. CONSTITUTIONAL LAW—FREE SPEECH—OBSCENITY—STANDARDS—LOCAL STANDARD.

The application of local standards of obscenity does not have a chilling effect on free speech because a local standard gives the prospective publisher an opportunity to determine more certainly whether his publication is within those standards, since a local standard is patently easier to ascertain than the elusive concept of a national standard.

21. CRIMINAL LAW—OBSCENITY—INTENT—BURDEN OF PROOF.

The intent of the defendant publisher to appeal to the prurient interest of the recipient of the alleged obscene material must be proved beyond a reasonable doubt in a criminal prosecution for violating the obscenity statute.

22. CRIMINAL LAW—OBSCENITY—NEW CONSTITUTIONAL STANDARD—PREJUDICE—APPEAL AND ERROR.

Convictions of publishing obscene materials are affirmed even though a new constitutional test, providing that given that the published material is obscene within the meaning of the

applicable state statute, the publisher loses any claim to protection under the constitution if his primary intent in publishing the material was to appeal to the recipient's prurient interest in sex, was enunciated after the defendants' trial where both sides introduced evidence on the pandering issue, both sides argued the pandering issue, the trial courts indicated the law on which their decisions had been made and that law had not been affected by the new constitutional test and the convictions could be affirmed solely on the basis of the law existing at the time of the decisions, because the existing law had not been affected by the new constitutional test.

Appeal from Kent, John T. Letts and Roman Snow, JJ. Submitted Division 3 December 5, 1969, at Grand Rapids. (Docket Nos. 6,399, 6,400, and 6,401.) Decided November 5, 1970. Leave to appeal granted February 9, 1971. 384 Mich 802.

Floyd Bloss was convicted of selling obscene literature. Defendant appeals. Affirmed. (Docket No. 6,399.)

Floyd Bloss and Clifford Hughes were convicted of selling obscene literature. Defendants appeal. Affirmed. (Docket Nos. 6,400, 6,401.)

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *James K. Miller,* Prosecuting Attorney, and *S. J. Venema,* Special Assistant Prosecuting Attorney, for the people.

*John W. Piggott,* for defendants.

Before: J. H. GILLIS, P. J., and McGREGOR and QUINN, JJ.

J. H. GILLIS, P. J. These three cases were consolidated on appeal on this Court's motion. They deal with related issues which call upon this Court

to determine whether the defendants in publishing[1] the material involved in this litigation violated Michigan's obscenity statute and to determine whether the statute as sought to be applied against the defendants conflicts with the restrictions on state action imposed by the First and Fourteenth Amendments to the Federal Constitution. In No 6401, in addition to the Federal challenge, the defendants assert that the Michigan obscenity statute violates the Michigan Constitution of 1963, art 1, §§ 5 and 17.[2]

Our obscenity statute proscribes the publication of "any obscene, lewd, lascivious, filthy or indecent, sadistic or masochistic" material. MCLA § 750.343a (Stat Ann 1970 Cum Supp § 28.575[1]). We have no difficulty or hesitation in branding as obscene, within the meaning of this statute, the material which the defendants are charged with publishing in these three cases. The words and pictures of the material, taken as a whole, have a strong tendency to arouse lustful thoughts and sexual desires in the average person in the community and the material is offensive to the common conscience of the community. These are not borderline publications and analysis of the material here would serve no useful purpose. Were it not for the constitutional questions presented, we would affirm the convictions in all three cases without further discussion.

Defendants have failed to articulate an argument to support their due process claim under the Mich-

---

[1] Throughout this opinion we use the word publish to mean sale distribution, or other dealings in obscene material which are forbidden by the statute.

[2] § 5: "Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press."

§ 17: "No person shall be  *  *  *  deprived of life, liberty or property, without due process of law."

igan Constitution. Nor do we see any merit to their position. For example, defendants assert in support of their due process claim that MCLA § 750.343b (Stat Ann 1970 Cum Supp § 28.575[2])[3] "is not couched in terms laid down by *Roth.*" Yet the statute is, almost *verbatim,* the jury instruction approved in *Roth* v. *United States*[4] (and *Alberts* v. *California*) (1957), 354 US 476 (77 S Ct 1304, 1 L Ed 2d 1498).

Just as language contained in a statute or court opinion is not necessarily appropriate for use in a jury instruction, *cf. In re Wood Estate* (1965), 374 Mich 278, the language of a jury instruction proper under the specific facts of one case does not neces-

---

[3] "The test to be applied in cases under section 343a of this act shall not be whether sexual desires or sexually improper thoughts would be aroused in those comprising a particular segment of the community, the young, the immature or the highly prudish, or would leave another segment, the scientific or highly educated or the so-called worldly wise and sophisticated, indifferent and unmoved. But such test shall be the effect of the book, picture or other subject to complaint considered as a whole, not upon any particular class, but upon all those whom it is likely to reach, that is, its impact upon the average person in the community. The book, picture or other subject of complaint must be judged as a whole in its entire context, not by considering detached or separate portions only, and by the standards of common conscience of the community of the contemporary period of the violation charged." MCLA § 750.343b(Stat Ann 1970 Cum Supp § 28.575[2]).

[4] "'The test is not whether it would arouse sexual desires or sexual impure thoughts in those comprising a particular segment of the community, the young, the immature or the highly prudish or would leave another segment, the scientific or highly educated or the so-called worldly wise and sophisticated indifferent and unmoved * * * .

"'The test in each case is the effect of the book, picture or publication considered as a whole, not upon any particular class, but upon all those whom it is likely to reach. In other words, you determine its impact upon the average person in the community. The books, pictures and circulars must be judged as a whole, in their entire context, and you are not to consider detached or separate portions in reaching a conclusion. You judge the circulars, pictures and publications which have been put in evidence by present-day standards of the community. You may ask yourselves does it offend the common conscience of the community by present-day standards.'" *Roth* v. *United States, supra,* 354 US at 490 (77 S Ct at 1312, 1 L Ed 2d at 1510).

sarily become appropriate for use in a statute. Section 343b does not qualify as a model of legislative draftsmanship, but it certainly is not void for any reasons stated in *Roth* or advanced by defendants.

In No 6401, defendants argue that the obscenity statute is void for vagueness. This legislation was adopted in reaction to *Butler* v. *Michigan* (1957), 352 US 380 (77 S Ct 524, 1 L Ed 2d 412), which declared Michigan's former obscenity statute unconstitutional, and, as we have noted, *Roth-Alberts, supra*. The legislature did not attempt to define obscenity in either the former or the present statute. This is in the tradition of the common law which leaves obscenity, like fraud, due care, and other concepts difficult to define, to be delineated by the courts on a case-by-case basis. *Roth* fully supports this practice.

"Many decisions have recognized that these terms of obscenity statutes are not precise. This Court, however, has consistently held that lack of precision is not itself offensive to the requirements of due process. The Constitution does not require impossible standards; all that is required is that the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. These words, applied according to the proper standard for judging obscenity, already discussed, give adequate warning of the conduct proscribed and mark boundaries sufficiently distinct for judges and juries fairly to administer the law. That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense." *Roth* v. *United States, supra,* at 491, 492 (77 S Ct at 1312, 1313, 1 L Ed 2d at 1510, 1511). [Citations and interior quotation marks omitted.]

Finally, defendants contend—and this is the only point that requires extended treatment—that Michigan's obscenity statute offends their right of free speech as guaranteed to them by the First and Fourteenth Amendments of the United States Constitution. Any discussion of this subject must start with *Roth-Alberts*. The dispositive question there was "whether obscenity is utterance within the area of protected speech and press." *Roth* v. *United States, supra,* at 481 (77 S Ct at 1307, 1 L Ed 2d at 1505). In holding that obscenity was not so protected, the Court said:

"[I]mplicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance. This rejection for that reason is mirrored in the universal judgment that obscenity should be restrained, reflected in the international agreement of over 50 nations, in the obscenity laws of all the 48 states, and in the 20 obscenity laws enacted by the Congress from 1842 to 1956." *Roth* v. *United States, supra,* at 484, 485 (77 S Ct at 1309, 1 L Ed 2d at 1507).

*Roth-Alberts* dealt with two cases, one an appeal from a conviction of violating a Federal obscenity statute, and the other an appeal from a conviction under a state obscenity statute. No issue was presented in either case concerning the obscenity of the material before the Court. Nonetheless, the Court undertook to define obscenity.

"Obscene material is material which deals with sex in a manner appealing to prurient interest." *Roth* v. *United States, supra,* at 487 (77 S Ct at 1310, 1 L Ed 2d at 1508).

With hindsight sharpened by the experience that state and Federal courts have had with this problem in the 13 years since *Roth-Alberts,* we believe that

in defining obscenity there, the Supreme Court made two fundamental errors—errors which have contributed to, if not caused, the disharmony among the justices of the Supreme Court ever since.

The first error was the attempt to define obscenity at all. Resolution of the two cases before it did not require the Court to offer a definition and, in giving the definition that it did, the Court failed to distinguish between *Roth,* a Federal prosecution, and *Alberts,* a state prosecution.

The Court failed to pay attention to the provisions of the two obscenity statutes involved. Despite the differences in language, the Court seemed to think that its definition of obscenity applied in both cases. In the Federal prosecution, the Court could interpret the statute any way it wanted to, whatever the wisdom of the situation required, but it had no right to so distort the meaning of the state statute before it. See the separate opinion of Justice Harlan in *Roth-Alberts, supra,* at 496–508 (77 S Ct at 1315–1321, 1 L Ed 2d at 1513–1520), concurring in part and dissenting in part.

The primary obligation to define obscenity in a state prosecution rests with the state, either through its legislature or its courts. The only function of the Supreme Court in this area is to determine whether that definition is, in the circumstances of the case before it, consistent with the defendant's rights to due process and free speech. Justice Harlan stated it well in his dissenting opinion in *Memoirs* v. *Massachusetts* (1966), 383 US 413, 458 (86 S Ct 975, 997, 16 L Ed 2d 1, 28):

"State obscenity laws present problems of quite a different order. The varying conditions across the country, the range of views on the need and reasons for curbing obscenity, and the traditions of local self-governments in matters of public welfare

all favor a far more flexible attitude in defining the bounds for the States. From my standpoint, the Fourteenth Amendment requires of a State only that it apply criteria rationally related to the accepted notion of obscenity and that it reach results not wholly out of step with current American standards. As to criteria, it should be adequate if the court or jury considers such elements as offensiveness, pruriency, social value and the like. *The latitude which I believe the States deserve cautions against any federally imposed formula listing the exclusive ingredients of obscenity and fixing their proportions."* (Emphasis supplied.)

In *Roth-Alberts* and the ensuing obscenity decisions of the Supreme Court, a majority of the justices recognize the right of the states to regulate and prohibit the publication of obscene materials, but, at the same time, most of them would require that the right to regulate obscenity be exercised within the framework of a Federal definition of obscenity. In our view the two principles are mutually exclusive. In attempting to reconcile them the Court set itself an impossible task which has resulted in the babble of opinions emanating from that Court over the past dozen years.

We do not mean to say that the state obscenity regulations are or should be free of any federal control, but we do believe that the state's definition of obscenity must be accepted by the Federal courts and a Federal court's sole function is to determine whether, in its application, the obscenity statute treads upon any legitimate constitutional interests of the defendant on trial.

The second fundamental error in the Court's approach was its focus upon the material involved rather than the defendant on trial.[5] It is the right

---

[5] "[T]his Court cannot avoid making an independent constitutional judgment on the facts of the case as to whether the material in-

of the defendant to publish, rather than the right of the material to be published, which should have been examined by the Court. But the Court attempted to define obscenity in an abstract manner without reference to the motives of the publisher. This flaw in the reasoning of the Court was pointed out in the separate concurring opinion of Chief Justice Warren:

"It is not the book that is on trial; it is a person. The conduct of the defendant is the central issue, not the obscenity of a book or picture. The nature of the material is, of course, relevant as an attribute of the defendant's conduct, but the materials are thus placed in context from which they draw color and character." 354 US at 495 (77 S Ct at 1314, 1315, 1 L Ed 2d at 1513).

Indeed, it was only on the basis of the publisher's state of mind that the Supreme Court was able to affirm the obscenity conviction in *Ginzburg* v. *United States* (1966), 383 US 463, 474, 475 (86 S Ct 942, 949, 16 L Ed 2d 31, 40):

"The fact that each of these publications was created or exploited entirely on the basis of its appeal to prurient interests strengthens the conclusion that the transactions here were sales of illicit merchandise, not sales of constitutionally protected matter."

*Jacobellis* v. *Ohio* (1964), 378 US 184 (84 S Ct 1676, 12 L Ed 2d 793) ; *Memoirs* v. *Massachusetts, supra; Ginzburg* v. *United States, supra;* and *Redrup* v. *New York* (1967), 386 US 767 (87 S Ct 1414, 18 L Ed 2d 515), *rehearing denied* (1967), 388 US 924 (87 S Ct 2091, 18 L Ed 2d 1377), taken together with the dozens of *per curiam* reversals by the Supreme

_____

volved is constitutionally protected." *Jacobellis* v. *Ohio* (1964), 378 US 184, 190 (84 S Ct 1676, 1679, 12 L Ed 2d 793, 799).

Court relying solely upon *Redrup,* have led some to assume—quite incorrectly—that the Supreme Court has adopted a stringent three-pronged constitutional restriction on the right of a state to regulate obscenity.   For example, the people's brief here states that the rule set down by the United States Supreme Court to determine the question of obscenity is:   (1) the dominant theme of the material taken as a whole appeals to a prurient interest in sex, (2) it is utterly without redeeming social value, and (3) it is patently offensive because it affronts the contemporary community standards.   This test was apparently taken from one of the opinions in *Memoirs* v. *Massachusetts, supra,* but that opinion was signed by only three justices of the Supreme Court.

We relied upon the same opinion to promulgate a similar rule in *People* v. *Billingsley* (1969), 20 Mich App 10.   There, while we recognized that no constitutional test of obscenity has been enunciated by the Supreme Court since *Roth,* we followed *Luros* v. *United States* (CA 8, 1968), 389 F2d 200, 205, where the Court said:

"[T]here is specific indication that a majority of the Supreme Court adopts standards 'not dissimilar' to banning only 'hard-core' pornography."

The writer of this opinion reluctantly concurred in the result in *Billingsley* because he felt bound to do so by the decisions of the United States Supreme Court.   Upon a closer reading of these cases and their divergent opinions, he now confesses that he was wrong.[6]

---

[6] For example, in *Billingsley,* we said that *Memoirs, supra,* held "that Massachusetts could not ban the sale of the sexual diary '*Fanny Hill*.'"   But three of the justices who voted for reversal of the conviction in *Memoirs* specifically disclaimed any such holding:

"It does not necessarily follow from this reversal that a determination that *Memoirs* [*Fanny Hill*] is obscene in the constitutional sense would be improper under all circumstances."   *Memoirs* v. *Massachusetts, supra,* at 420 (86 S Ct at 978, 16 L Ed 2d at 6).

The Supreme Court has not yet devised a rule of law in this area approved by a majority of the justices so that it could be considered a decision of the Court binding upon all lower Federal and state courts. The Court frankly acknowledged its division in *Redrup* in a brief *per curiam* opinion summarizing the individual views of the justices. We view *Redrup* and its progeny simply as *ad hoc* decisions—a coalition of the divergent views of a majority of the justices that First and Fourteenth Amendment rights had been violated in a particular case. In these cases no rationale of decision has commanded the support of five justices; the individual views of the justices cannot be relied upon as *stare decisis*.

"It is unnecessary to state the reasons [for and against] because the Court is divided on it, and, consequently, no principle is settled." *The Antelope: The Vice-Consuls of Spain and Portugal, Libellants* (1825), 23 US (10 Wheat) 66, 126 (6 L Ed 268, 283).

"No attempt will be made to analyze [the cases] or to decide on their application to the case before us, because the judges are divided respecting it. Consequently, the principles of law which have been argued cannot be settled   *   *   *   ." *Etting* v. *Bank of United States* (1826), 24 US (11 Wheat) 59, 78 (6 L Ed 419, 423).[7]

---

7. The ultimate judicial power of the United States resides in the Supreme Court. Every lower court looks to it for guidance in Federal matters. When it cannot give such guidance because of the division of the justices on a particular subject, the Court should decline to review cases in that area until the justices can agree on an opinion of the Court. Certainly the Supreme Court has a more important function in our jurisprudence than to review the dreary material of a smut peddler and the factual circumstances of its publication for the sole purpose of issuing its decision on a "for this case only" basis. The Court lends itself "to an unjustifiable intrusion upon the time of [the] court." *Conway* v. *California Adult Authority* (1969), 396 US 107, 110 (90 S Ct 312, 314, 24 L Ed 2d 295, 298).

In the absence of any definitive ruling by the United States Supreme Court, we propose a test today to determine the free speech right of a defendant in an obscenity trial. The test is this: Given that the published material is obscene within the meaning of a state statute, not void for vagueness, the publisher of the material loses any claim to protection under the First and Fourteenth Amendments if his primary intent in publishing the material was to appeal to the recipient's prurient interest in sex.

We think such a test is consistent with the expressed philosophy of a majority of the justices of the Supreme Court who have wrestled with the obscenity-free speech problem during the past 13 years.

Specific intent of the defendant would thus become a factual question for determination by the jury under appropriate instructions from the court. As in any specific-intent criminal prosecution, the intent of the defendant need not be proven directly but can be inferred from his conduct, the nature of the material involved, and the setting in which it was published.

Had the test which we announced today been used by the Supreme Court in *Ginzburg,* it would have allowed the Court there to reach its result without the tortured logic it was required to use under the divers definitions of obscenity proposed from time to time by the several justices. Pandering, by itself, would not transform material outside the definition

An even greater mischief is pointed out by Chief Justice Burger in his dissenting opinion in *Walker* v. *Ohio* (1970), 398 US 434 (90 S Ct 1884, 26 L Ed 2d 385): "I find no justification, constitutional or otherwise, for this Court's assuming the role of a supreme and unreviewable board of censorship for the 50 states, subjectively judging each piece of material brought before it without regard to the findings or conclusions of other courts, state or federal. That is not one of the purposes for which this Court was established."

of our obscenity statute into material within the definition but it would, of itself, be sufficient to sustain a finding by a jury that the defendant's primary purpose was to appeal to the prurient interest of the reader.

The material itself might be of controlling evidentiary force in determining the question of intent. It would not have to be hard-core pornography. A nudist magazine, featuring photographs of devotees practicing their recreation, might not, without more, be of sufficient probative force to establish the seller's intent. However, if the magazine contains many pictures which tend to emphasize the genitalia by the posings of the subjects; the accompanying text is either totally unrelated to the photographs or is full of double-meaning sentences and phrases; and there is proof of the publisher's knowledge of the nature of the material, this would be sufficient evidence to sustain a finding of his primary intent to appeal to the prurient interests of the reader. Similarly, the so-called art magazines with nude forms posed in a manner to emphasize repetitiously the reproductive organs, with models posed in a series of 10 to 15 photographs, commencing fully clothed and ending fully unclothed—a pictorial striptease, so to speak—would be sufficient to sustain a finding by a jury that the publisher's intent was to arouse the reader's prurient interest in sex rather than to furnish him with instructions in the human anatomy useful for pursuit of art. The fact that the material was substantially overpriced considering the quality of the printing or the writing, or its literary worth or artistic value would be a factor which could be presented to the jury as bearing on the question of intent.[8]

---

[8] The examples in this paragraph are all from the record before us.

The setting in which the material is published would be relevant on the question of the defendant's intent. For example, a medical text book minutely describing in words and photographs the reproductive organs of a man and a woman or a handbook on sexual techniques with explicit drawings or photographs, designed for the use of married couples or marriage counselors and psychiatrists to assist their patients would not be obscene if sold for such a purpose. If, however, such material had been commercially exploited to the general public by a book store operator and the jury found, under appropriate instructions and upon sufficient evidence, that the operator of the book store in doing so intended to appeal to the prurient interests of the buyers rather than to any legitimate need for medical information, then in such circumstances he would lose his protection under the First and Fourteenth Amendments and could be convicted.[9]

Defendants urge, with the support of several lower federal court decisions, that material must be utterly without redeeming social value before it can be branded as obscene. We would normally accord great weight to the decisions of the lower Federal courts in the area of Federal constitutional law, but they are not binding on us, particularly in view of the unsettled nature of the law of obscenity. *Cf. Schueler* v. *Weintrob* (1960), 360 Mich 621, 633, 634. We reject such a rule as being unsound. It would create a loophole large enough to allow

---

[9] We do not decide whether such books published in such circumstances would come within the ambit of the Michigan Obscenity Statute as it now reads. All we are saying is that Michigan has the power to make criminal the publication of such books with such intent. As we have already noted, amendments to the Michigan statute were adopted in the wake of *Butler* v. *Michigan* (1957), 352 US 380 (77 S Ct 524, 1 L Ed 2d 412), and *Roth-Alberts, supra.* They probably do not exercise the full right and power of the state to regulate obscenity. We needn't decide the exact limits of the statute because the publications here are nowhere near its outer limits.

passage of a truckload of pornography as the smut peddlers have already discovered.[10] The argument was refuted to our satisfaction in Justice Clark's dissenting opinion in *Memoirs* v. *Massachusetts, supra,* at 441–443 (86 S Ct at 989, 990, 16 L Ed 2d at 18–20):

"While there is no majority opinion in this case, there are three Justices who import a new test into that laid down in [*Roth*], namely, that '[a] book cannot be proscribed unless it is found to be *utterly* without redeeming social value.' I agree with my Brother White that such a condition rejects the

---

[10] Examples abound in the exhibits before this Court of an attempt to commingle material which has no value except as an appeal to the prurient interest with material which has no logical relationship, but has some social value. One of the magazines before this Court has an obvious appeal to the prurient interest of homosexuals containing page after page of photographs of nude young men which greatly emphasize the sexual organs. Not a single line of text accompanies these photographs. In one photograph the sex organ is framed by a portion of the railing on a porch through which the picture had been made and the balance of the body is all but obscured, thus rendering the picture useless to an art student studying anatomy. About every tenth page contains a line drawing of a nude attributed to Michelangelo, Matisse, or some other great master. Obviously the producer of the magazine has carefully followed the guidelines contained in some of the opinions of the Supreme Court justices. Under their test the magazine could not be deemed obscene because it does contain, in two or three pages out of 40 or 50, material of some social value.

Another exhibit, a so-called girlie magazine, with an obvious appeal to the prurient interests of males with more orthodox tastes in sex has offered its readers an ingenious recipe for a hot dog sauce which can be prepared simply by mixing ketchup and mustard. This recipe is offered along with 30 photographs of nudes lounging around a swimming pool. Culinary equipment is to be seen in only two small black and white photographs of middle-aged nudes who appear in no other pictures. Seven pages of nudes later is a double-page full color picture of a nude and *fully* exposed girl. The relationship of this picture to the text is not pointed out.

Some of the material contains in small print a disclaimer of an intent to appeal to the prurient interest of the reader. It is said that the magazine is intended only for use by art students, serious devotees of nudism and so forth. While such disclaimers might be used by the defendant as evidence of his lack of intent to appeal to the prurient interest of the recipient, such disclaimer of itself would not necessarily bar prosecution, if the state could prove the requisite intent, notwithstanding the contrary disclaimer.

basic holding of *Roth* and gives the smut artist free rein to carry on his dirty business. My vote in that case—which was the deciding one for the majority opinion—was cast solely because the Court declared the test of obscenity to be: 'whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' I understand that test to include only two constitutional requirements: (1) the book must be judged as a whole, not by its parts; and (2) it must be judged in terms of its appeal to the prurient interest of the average person, applying contemporary community standards. Indeed, obscenity was denoted in *Roth* as having *'such slight social value as a step to truth that any benefit that may be derived * * * is clearly outweighed by the social interest in order and morality * * * .'* Moreover, in no subsequent decision of this Court has any 'utterly without redeeming social value' test been suggested, much less expounded. * * * The first reference to such a test was made by my Brother Brennan in [*Jacobellis*] seven years after *Roth*. In an opinion joined only by Justice Goldberg, * * * he proceeded to add: 'We would reiterate, however, our recognition in *Roth* that obscenity is excluded from the constitutional protection only because it is "utterly without redeeming social importance." ' " (Citations omitted.)

Neither the First nor the Fourteenth Amendments in our view prohibits a state from punishing the publication of books and pictures where the primary purpose of the publisher is to appeal to the prurient interest of the recipient. Staying with the example of the medical text book, it has an obvious social value and the constitution would not allow its suppression by the state. But we perceive no social value in allowing such a book to be published solely for the purpose of appealing to the prurient interest

of the reader. Likewise, we see no constitutional objection to a state statute which makes criminal the publication of such a book with such intent.

In such an instance, the state is suppressing not the book but antisocial conduct connected with the book. The constitution does not place books beyond all control of the states. If the pages of a book are lit intentionally to set fire to a building, the act may be punished as arson. If those same pages are published for the primary purpose of arousing lustful thoughts, the act may be punished as obscenity. In the latter case, we are talking of a book *qua* book. But this is not a difference in which we perceive a constitutional distinction.

It is the view of Justice Black and Justice Douglas that the First Amendment, made obligatory on the states by the Fourteenth Amendment, has a "broad sweep" which practically denies the states any power to regulate obscenity. In *Roth* v. *United States, supra,* at 508 (77 S Ct at 1321, 1 L Ed 2d at 1520), their dissent said:

"When we sustain these convictions, we make the legality of a publication turn on the purity of thought which a book or tract instills in the mind of the reader.  *  *  *  By these standards punishment is inflicted for thoughts provoked, not for overt acts nor antisocial conduct."

Under our decision today, what is punished is not the prurient thoughts provoked by the material but the intention of the defendant to provoke such thoughts and his exploitation of the provocative nature of the material.[11]

---

[11] In *Memoirs* v. *Massachusetts, supra,* Justice Douglas said it is yet to be proven "that erotica produce antisocial sexual conduct." 383 US at 431 (86 S Ct at 984, 16 L Ed 2d at 13). Whether he is correct or not, it is the function of the legislature and not Justice Douglas or any other judge to make such a judgment. He cites ministers, sociologists, and other authorities to support his propo-

We are required by the Michigan law to judge the material "by the standards of common conscience of the community of the contemporary period of the violation charged." MCLA § 750.343b, *supra.* Defendants argue that this refers to a national standard and not a local standard. To this end they were allowed to introduce evidence that the material upon which the prosecution was based was sold in other states without sanction.

We believe, as the lower court did, that the legislature was referring to a local community standard. Such a standard is appropriate and consistent with the constitution. This is the view of Chief Justice Warren and Justice Clark in their opinion in *Jacobellis, supra.*

"It is my belief that when the Court said in *Roth* that obscenity is to be defined by reference to 'community standards', it meant community standards— not a national standard, as is sometimes argued. I believe that there is no provable 'national standard', and perhaps there should be none. At all events this Court has not been able to enunciate one, and it would be unreasonable to expect local courts to divine one. It is said that such a 'community' approach may well result in material being proscribed as obscene in one community but not in another, and, in all probability, that is true. But com-

sition. May we not assume that the legislature of Michigan consulted similar authorities before it determined to ban obscenity?

The point of footnote 10 to Justice Douglas' opinion seems to be that from such books the young can learn what life is all about. " * * * They will learn what is in the world and in its people." Applied to the exhibits in this case, the idea is absurd. In one, for example, the "novel" describes one day in the life of a French businessman. Upon awakening, he had intercourse with the maid; before noon he had intercourse with each of three secretaries; after lunch ditto with his mistress and with his mistress' neighbor; after dinner with a pick-up in a cabaret; and finally at home that night, to end the story on a high moral level, he forced his attentions on his wife against her will. How will this book teach "what is in the world and in its people"?

munities throughout the Nation are in fact diverse, and it must be remembered that, in cases such as this one, the Court is confronted with the task of reconciling conflicting rights of the diverse communities within our society and of individuals." 378 US at 200, 201 (84 S Ct at 1685, 12 L Ed 2d at 805).

Since the jury is the ultimate judge of the facts in a case, to require them to determine what the national standard is would be to saddle them with an impossible task. A jury in Petoskey would know the standards of the Petoskey community, but, even if each member were well traveled, it would have a hard time in defining a national standard taking into consideration the alleged permissiveness of Las Vegas and the alleged puritanism of Boston.

Assuming a national standard, each well-tried obscenity case would devote at least a week just to the question of community standards. It would require expert witnesses from the four corners of the nation. The burden of such a trial would be as onerous to the defendant as to the state.

Citing *Pennekamp v. Florida* (1946), 328 US 331 (66 S Ct 1029, 90 L Ed 1295), Justice Brennan argued in *Jacobellis, supra,* that a local community standard test would mean that "the constitutional limits of free expression in the Nation would vary with state lines." 378 US at 194, 195 (84 S Ct at 1682, 12 L Ed 2d at 802). Implicit in his position is that no state may regulate obscenity more strictly than another. Yet Justice Brennan in *Roth* clearly recognized the right of the state to regulate obscenity. Does this not imply that one state may choose to adopt more stringent regulations than another?

*Pennekamp* has no application here. Under the test we announced today, the limits of free expression would not vary from state to state. First Amend-

ment protection would be lost by *every* person who published material with the primary purpose of appealing to the recipient's prurient interest in sex. *In every state, this would be true.* But one state's decision to condemn such unprotected activity would not be repugnant to the constitution simply because other states might choose to ignore such conduct or regulate it less severely.

We are one nation indivisible but it does not follow that we have one society homogenized. The constitution explicitly recognizes the sovereignty of the states in most areas. It is for the states to decide whether abortion should be tolerated or to what extent gambling shall be suppressed. Similarly, it is the state's right to determine how permissive it shall be in the area of publications which, designed to appeal to prurient interests in sex, are outside the protection of the First Amendment. The constitution does not require Michigan to enlarge its permissiveness to that of another state any more than it would require us to be more restrictive because other states choose to follow that course. We see no difference constitutionally between the states acting with variety in this area through differing legislation and their acting with variety through the application of differing local community standards.

Justice Brennan also argued that if publication of a book results in a conviction in one state, it would have a chilling effect on publication of that book in another state because "sellers and exhibitors would be reluctant to risk criminal conviction in testing the variation between the two places." 378 US at 194 (84 S Ct at 1681, 12 L Ed 2d at 801). The argument is not appealing to us. Aside from the fact that there seems to be little reluctance on the part of book

store operators to invite litigation in this area,[12] it seems to us that applying local standards gives the prospective publisher an opportunity to determine more certainly whether his publication is within or without those standards because a local standard is patently more easily ascertainable than the elusive concept of a national standard.

Just to approach uniformity in this area would require not only the application of a national standard but passage of a national obscenity law. Most states have adopted the Uniform Commercial Code and other uniform laws designed to relieve the problems interstate businessmen and interstate travelers face because of varying state laws. But state sovereignty being what it is, nothing in the constitution requires such state action. We see no reason why the states should adopt a Uniform Obscenity Law to accommodate the interstate smut peddlers.

Even this would not achieve the uniformity Justice Brennan argued for in *Jacobellis,* as Justice Brennan pointed out in his opinion in *Roth.*

"It is argued that because juries may reach different conclusions as to the same material, the statutes must be held to be insufficiently precise to satisfy due process requirements. But, it is common experience that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system." 354 US at 492, fn 30 (77 S Ct at 1313, 1 L Ed 2d at 1511).

The test we announce today, making the defendant's right of free speech depend upon the intent with which he speaks, is fully consistent with decisions of the United States Supreme Court dealing

---

[12] Defendant Bloss is an example. We are aware of seven cases in which he was directly involved, including the three cases now before us. He pressed one case to the United States Supreme Court.

with the related problems of the extent to which the right of free speech bars actions for defamation in State courts. In *New York Times Co.* v. *Sullivan* (1964), 376 US 254 (84 S Ct 710, 11 L Ed 2d 686, 95 ALR2d 1412), and the ensuing defamation suits that reached the Supreme Court, the Court did not undertake to alter the concepts of defamation developed through the years by the state courts. Nor did the Court in any instance examine the nature of the defamatory material to determine whether the utterance was protected free speech. The Court relied upon a state-of-mind test which essentially postulated that if the defamatory utterance was made with malice, it was not protected free speech.

"Calculated falsehood falls into that class of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" *Garrison* v. *Louisiana* (1964), 379 US 64, 75 (85 S Ct 209, 216, 13 L Ed 2d 125, 133).

We see no difference constitutionally between the calculated falsehood and the calculated appeal to prurient interest. Neither is a communication of ideas entitled to constitutional protection.[13]

In the defamation cases, the Court requires that the public figure establish the malice of the defendant with "convincing clarity." *Sullivan, supra,* 376 US at 286, 287 (84 S Ct at 729, 730, 11 L Ed 2d at 710, 711). This is to prevent a jury from finding

---

[13] In *People* v. *Billingsley* (1969), 20 Mich App 10, 17, we said: "The constitutional right to communicate ideas would be unduly limited if the state could take upon itself the right to prohibit the use of certain words, however offensive and odious they may be, to communicate those ideas." We do not retreat from this holding in *Billingsley*. If the intent of the publisher is to communicate an idea, then he has a right to communicate that idea under the constitution in any language he chooses.

malice where there is none simply because the defendant has been expressing views unpopular in the local area. By similar reasoning, the intent of the publisher to appeal to the prurient interest of the recipient must be established with convincing clarity in any civil proceedings brought under the Michigan obscenity statute. In a criminal prosecution, of course, the intent of the defendant would have to be established beyond a reasonable doubt.

There is more than ample evidence in the records below to support a finding that defendants' primary purpose in publishing the material was to appeal to the prurient interest of the recipient. In each case the trial judge made a specific finding to that effect.[14]

We have had some reservations about affirming these convictions on the basis of a constitutional test enunciated after trial. On careful consideration, however, we find nothing unfair to the defendants in this procedure. The issue of pandering was

---

[14] In No 6399, Judge Letts said: "It is the honest opinion of the court that the writing materials therein, not having authors' names nor bibliography, or footnoted in any way, would indicate it is there for one specific purpose only, that is for the purpose of breaking up the dominant theme in an attempt to move inside the legal holdings about appealing to the prurient interest, and in the opinion of the court this failed to do so."

In No 6400, Judge Letts found: "It would seem to me that the main thrust of the entire operation of the Capri complex, if you call it that, is toward commercialization of sex, which is pandering. It is done in the Capri Theatre with the advertising there in the lobby and the trailers, as testified to here in open court, pointing out that this material may be purchased at the Capri Book Store, at such and such address. It is the feeling of this court that if the Supreme Court in *Ginzburg* can set forth that the purveying of sex in books, such as the ten that we have before us, is not necessarily just obscene but, as their decision indicated, it was pandering, then this court, which is a lesser court, can follow suit, after having made the determination based upon the testimony."

In No 6401, Judge Snow found: "There was evidence the defendants' publications were originated or sold as stock in trade of the business of pandering, that is, the business of purveying textual or graphic matter openly advertised to appeal to the erotic interest of their customers."

clearly before the court in each case and both sides introduced evidence on the proposition and it was argued to the court.  We could affirm the convictions solely on the basis of *Ginzburg,* as the trial courts indicated that they had done.

Finding no error, we affirm the judgments below. All concurred.