957 P.2d 691 (1998)
135 Wash.2d 618
STATE of Washington ex rel. PUBLIC DISCLOSURE COMMISSION, Appellant,
v.
119 VOTE NO! COMMITTEE, Eileen Brown, Executive Director, Thomas Finch, Treasurer, Respondents.
American Civil Liberties Union of Washington, a Washington nonprofit corporation, on behalf of itself and its members, Appellants,
Irene Heninger, Jocelyn Marchisio, Jim Whiteside, Don Brazier, and Gary Machara, Commissioners, Washington State Public Disclosure Commission, in their official capacity; and Christine O. Gregoire, Attorney General of the State of Washington, in her official capacity, Respondents.
No. 64332-6.
Supreme Court of Washington, En Banc.
Argued June 26, 1998.
Decided June 11, 1998.
Reconsideration Denied August 14, 1998.
*692 Christine Gregoire, Attorney General, Thomas G. Holcomb, Assistant Attorney General, Olympia, for Appellant.
*693 Foster, Pepper & Shefelman, Christopher Kane, Bendich, Stobaugh & Strong, David Stobaugh, Seattle, for Respondent.
SANDERS, Justice.
The Public Disclosure Commission (PDC) alleges the 119 Vote No! Committee violated RCW 42.17.530(1)(a) by publishing false political advertising. We must decide two issues: does RCW 42.17.530(1)(a) violate the First Amendment on its face; and, if not, did the subject advertisement violate the statute. As we conclude, RCW 42.17.530(1)(a) indeed facially violates the First Amendmentthe second question falls by the way.

I. Facts
The State of Washington on relation of the Public Disclosure Commission brought suit against the 119 Vote No! Committee, its executive director and its treasurer. The State alleges the Committee published political advertising contrary to RCW 42.17.530(1)(a) during the course of its campaign in opposition to Initiative 119, the so-called "Death with Dignity Act." Ultimately the initiative went down to defeat at the polls on November 5, 1991. The one-page printed advertisement begins with the words "Vote No!" superimposed over the words "Initiative 119," Clerk's Papers (CP) at 18, and generally suggests the initiative invites assisted suicide without sufficient safeguards.[1]
RCW 42.17.530(1)(a) prohibits any person from sponsoring, with actual malice, a political advertisement containing a false statement of material fact.[2] The State's complaint alleged the advertisement distributed by the Committee "contained false statements of material fact, and was published by the Committee with actual malice, that is, with knowledge that the statements contained in the advertisement were false or in reckless disregard of whether the statements were false." CP at 6. The PDC's referral arose from a complaint filed by proponents of the initiative. The State's complaint prayed the Committee and individual defendants be fined up to $10,000 plus costs, attorney fees, and treble damages.
The Committee moved to dismiss for failure to state a claim for which relief could be granted. CR 12(b)(6). The American Civil Liberties Union of Washington (ACLU) intervened pursuant to CR 24 to challenge the facial constitutionality of RCW 42.17.530(1)(a) by declaratory judgment.[3] *694 Following briefing and argument, the trial court concluded the advertisement did not contain materially false statements and dismissed. The trial court awarded the Committee attorney fees and costs pursuant to RCW 42.17.400(5).[4]
Notwithstanding dismissal of the principal action against the Committee, the ACLU pursued its claim for a declaratory judgment of invalidity.[5] The ACLU and the State cross-moved for summary judgment each seeking a declaration as to the statute's constitutionality under the First Amendment. On stipulated facts concerning the enforcement of RCW 42.17.530(1)(a) the court granted the State's motion, concluding the statute facially passed First Amendment muster. Both parties appealed. We granted direct review.

II. Standard of Review
"Under CR 12(b)(6), a complaint can be dismissed if it fails to state a claim upon which relief can be granted. Because a trial court's dismissal under this rule is a holding on a question of law, appellate review is de novo." Hoffer v. State, 110 Wash.2d 415, 420, 755 P.2d 781 (1988). Likewise, the facial constitutionality of a statute is a question of law which requires de novo review. Timberline Air Serv. Inc. v. Bell Helicopter-Textron, Inc., 125 Wash.2d 305, 311, 884 P.2d 920 (1994).

III. Legal Analysis
RCW 42.17.530(1)(a) provides: "It is a violation of this chapter for a person to sponsor with actual malice ... [p]olitical advertising that contains a false statement of material fact...." The Committee and the ACLU argue the statute is a facially unconstitutional abridgment of free speech. The State asserts its interest in an informed electorate justifies this burden upon political debate.
The constitutional guarantee of free speech has its "fullest and most urgent application" in political campaigns. Brown v. Hartlage, 456 U.S. 45, 53, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982) (quoting Monitor Patriot Co. v. Roy, 401 U.S. 265, 271-72, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971)). Therefore, the State bears a "well-nigh insurmountable" burden to justify RCW 42.17.530's restriction on political speech. Meyer v. Grant, 486 U.S. 414, 425, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). This burden requires the court to apply "exacting scrutiny" to RCW 42.17.530(1)(a). Meyer, 486 U.S. at 420, 108 S.Ct. 1886. See also Buckley v. Valeo, 424 U.S. 1, 39, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Exacting scrutiny will invalidate the statute unless the State demonstrates a compelling interest that is both narrowly tailored and necessary. McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 347, 115 S.Ct. 1511, 1519, 131 L.Ed.2d 426 (1995); Burson v. Freeman, 504 U.S. 191, 198, 112 S.Ct. 1846, *695 119 L.Ed.2d 5 (1992). Such burdens are rarely met. Burson, 504 U.S. at 199-200, 112 S.Ct. 1846. Ino Ino, Inc. v. City of Bellevue, 132 Wash.2d 103, 114, 937 P.2d 154 (1997) ("The State bears the burden of justifying a restriction on speech.").

A. RCW 42.17.530(1)(a) infringes on speech protected by the First Amendment
Uninhibited speech "`is the single most important element upon which this nation has thrived.'" Nelson v. McClatchy Newspapers, Inc., 131 Wash.2d 523, 536, 936 P.2d 1123 (quoting Guzick v. Drebus, 305 F.Supp. 472, 481 (N.D.Ohio 1969), aff'd, 431 F.2d 594 (6th Cir.1970), cert. denied, 401 U.S. 948, 91 S.Ct. 941, 28 L.Ed.2d 231 (1971)), cert. denied, ___ U.S. ___, 118 S.Ct. 175, 139 L.Ed.2d 117 (1997). Free speech is revered as the "Constitution's majestic guarantee," central to the preservation of all other rights. Id. at 536, 936 P.2d 1123. Advocacy of one's political views through leafleting lies at the very core of our First Amendment freedoms. McIntyre, 514 U.S. at 346-47, 115 S.Ct. 1511; Meyer, 486 U.S. at 421-22, 108 S.Ct. 1886.
The State asserts it may prohibit false statements of fact contained in political advertisements. This claim presupposes the State possesses an independent right to determine truth and falsity in political debate. However, the courts have "consistently refused to recognize an exception for any test of truthwhether administered by judges, juries, or administrative officials and especially one that puts the burden of proving truth on the speaker." New York Times Co. v. Sullivan, 376 U.S. 254, 271, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964).
Rather, the First Amendment operates to insure the public decides what is true and false with respect to governance. Meyer, 486 U.S. at 419-20, 108 S.Ct. 1886; Riley v. National Fed. of the Blind of North Carolina, Inc., 487 U.S. 781, 791, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). In Meyer, the Supreme Court explained:
"`The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind.... In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us.' Thomas v. Collins, [323 U.S. 516, 545, 65 S.Ct. 315, 89 L.Ed. 430 (1945)] (Jackson, J., concurring)]." [Grant v. Meyer, 828 F.2d 1446, 1455 (10th Cir. 1987)].
Meyer, 486 U.S. at 419-20, 108 S.Ct. 1886 (emphasis added).
Particularly in the religious and political realms, "the tenets of one man ... seem the rankest error to his neighbor." Cantwell v. Connecticut, 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352 (1940). Therefore, the Supreme Court has recognized that to sustain our constitutional commitment to uninhibited political discourse, the State may not prevent others from "resort[ing] to exaggeration, to vilification of men who have been, or are, prominent in church and state, and even to false statement." Id. (emphasis added). At times such speech seems unpalatable, but the value of free debate overcomes the danger of misuse. McIntyre, 514 U.S. at 357, 115 S.Ct. 1511. For even false statements make valuable contributions to debate by bringing about "the clearer perception and livelier impression of truth, produced by its collision with error." New York Times, 376 U.S. at 279 n. 19, 84 S.Ct. 710 (quoting John S. Mill, On Liberty 15 (Oxford, Blackwell 1947)).
Specifically, the First Amendment prohibits the State from silencing speech it disapproves, particularly silencing criticism of government itself. Threats of coerced silence chill uninhibited political debate and undermine the very purpose of the First Amendment. See Riley, 487 U.S. at 791, 108 S.Ct. 2667; Brown, 456 U.S. at 61, 102 S.Ct. 1523; Meyer, 486 U.S. at 419-20, 108 S.Ct. 1886.
[The Founders of the nation] believed that freedom to think as you will and speak as you think are means indispensable to the discovery and spread of political truth.... Believing in the power of reason as applied through the public discussion, they eschewed silence coerced by lawthe argument of force in its worst form. *696 Whitney v. California, 274 U.S. 357, 375-76, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring), overruled on other grounds by Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). See also New York Times, 376 U.S. at 270, 84 S.Ct. 710. The State cannot "substitute its judgment as to how best to speak for that of speakers and listeners; free and robust debate cannot thrive if directed by the government." Riley, 487 U.S. at 791, 108 S.Ct. 2667. "For speech concerning public affairs is more than self-expression; it is the essence of self government." Garrison v. Louisiana, 379 U.S. 64, 74-75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), overruled on other grounds sub nom. by Curtis Publ'g Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).
Instead of relying on the State to silence false political speech, the First Amendment requires our dependence on even more speech to bring forth truth. Brown, 456 U.S. at 61, 102 S.Ct. 1523. See also Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-40, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In the political context, a campaign's factual blunder is most likely noticed and corrected by the campaign's political opponent rather than the State. Id. Contrary to claims made by Justice Talmadge in his concurrence, the Supreme Court has refused to recognize the possibility of "`an eleventh-hour anonymous smear campaign'" as enough to justify a restriction on speech. McIntyre, 514 U.S. at 352 n. 16, 115 S.Ct. 1511 (quoting People v. White, 116 Ill.2d 171, 506 N.E.2d 1284, 1288, 107 Ill.Dec. 229, 233 (1987)). Moreover, a well-publicized, yet bogus, complaint to the PDC on election eve raises the same concern. Therefore, "[t]he preferred First Amendment remedy of `more speech, not enforced silence' thus has special force." Brown v. Hartlage, 456 U.S. 45, 61, 102 S.Ct. 1523, 1533, 71 L.Ed.2d 732 (1982) (citation omitted). Underlying our dependence upon more speech is the presupposition "that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.'" New York Times, 376 U.S. at 270, 84 S.Ct. 710 (quoting United States v. Associated Press, 52 F.Supp. 362, 372 (S.D.N.Y.1943)).
RCW 42.17.530 coerces silence by force of law and presupposes the State will "separate the truth from the false" for the citizenry. The government made a similar attempt to suppress "seditious libel" in the Sedition Act of 1798, 1 Stat. 596. New York Times, 376 U.S. at 273, 84 S.Ct. 710. That Act made it a crime for any person to write, print, utter or publish any false writings against the government. Id. at 273-74, 376 U.S. 254 (quoting 1 Stat. 596). The Act was vigorously condemned as unconstitutional because it inevitably chilled that political debate needed for self-governance; however, it was allowed to expire by its own terms in 1801 before judicial challenge.[6]Id. at 274, 276, 84 S.Ct. 710. The First Amendment exists precisely to protect against laws such as RCW 42.17.530(1)(a) which suppress ideas and inhibit free discussion of governmental affairs. See McIntyre, 514 U.S. at 357, 115 S.Ct. 1511; Mills v. Alabama, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966).
Even assuming, as per Justice Talmadge's concurrence, that malicious falsehoods against candidates are beyond constitutional protection, this statute has broader reach and brings within its sweep every maliciously false statement of "material fact" whether it is defamatory to an individual or not. Justice Talmadge's concurrence cites no authority to support its broad claim that all false statements in a political advertisement, including statements relating to issues campaigns, may be prohibited as unprotected speech. Moreover, the statutory requirement that malice be proved by a high standard of proof does not cure the infirmity as the chilling effect of possible governmental sanction will not be lost on the faint of heart.

B. RCW 42.17.530(1)(a) does not serve a compelling state interest
Because RCW 42.17.530(1)(a) infringes upon protected speech, the court must apply *697 "exacting scrutiny." The State bears the "well-nigh insurmountable" burden to prove a compelling interest that is both narrowly tailored and necessary to achieve the State's asserted interest. McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 347, 115 S.Ct. 1511, 1519, 131 L.Ed.2d 426 (1995); Burson, 504 U.S. at 198, 112 S.Ct. 1846. States rarely meet this heavy burden. Burson, 504 U.S. at 199-200, 112 S.Ct. 1846.
The State claims its interest to foster an informed electorate outweighs the imposition upon political expression by RCW 42.17.530(1)(a). The State relies heavily on defamation cases to prove a compelling interest to justify intrusion into public debate citing Gertz, 418 U.S. at 340, 94 S.Ct. 2997, which states: "[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in `uninhibited, robust, and wide-open' debate on public issues." See also Garrison, 379 U.S. at 75, 85 S.Ct. 209 (quoting New York Times Co., 376 U.S. at 270, 84 S.Ct. 710). The State argues the language in these defamation cases applies with equal force to all political speech, even if no one is defamed.[7]
However the State's reliance on the law of defamation is misplaced. By its nature defamation concerns statements made by one person against another and is designed to protect the property of an individual in his or her good name.
The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by a defamatory falsehood.... [T]he individual's right to the protection of his own good name "reflects no more than our basic concept of the essential dignity and worth of every human beinga concept at the root of any decent system of ordered liberty."
Gertz, 418 U.S. at 341, 94 S.Ct. 2997 (quoting Rosenblatt v. Baer, 383 U.S. 75, 92, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966) (Stewart, J., concurring)). Clearly, a competing interest exists in defamation cases which is absent here. As then-Professor Fried explained:
Free speech cases often explain that "[t]here is no such thing as a false idea." But why may the state intervene to prohibit or punish factually false statements? Defamation and deception are actionable wrongs, perhaps on the reasoning I have already offered: they vindicate private rights invoked by, or at least on behalf of, private individuals. But the First Amendment precludes punishment for generalized "public" frauds, deceptions and defamation. In political campaigns the grossest misstatements, deceptions, and defamations are immune from legal sanction unless they violate private rightsthat is, unless individuals are defamed.[[8]]
Charles Fried, The New First Amendment Jurisprudence: A Threat to Liberty, 59 U. Chi. L.Rev. 225, 238 (1992) (footnotes omitted).
However RCW 42.17.530(1)(a) restricts political speech absent the competing interest present in defamation cases, and, unlike a defamation suit, creates a cause of action for the government to pursue against a private person. "The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them for defamatory falsehood." Gertz, 418 U.S. at 341, 94 S.Ct. 2997. See also Rosenblatt, 383 U.S. at 93, 86 S.Ct. 669 ("[A]n action for damages is the only hope for vindication or *698 redress the law gives to a man whose reputation has been falsely dishonored.").
Additionally, the State relies upon the United States Supreme Court's decision in McIntyre, as well as this court's decision in In re Donohoe, 90 Wash.2d 173, 580 P.2d 1093 (1978), to support its contention that it has a compelling interest to regulate maliciously false speech. But neither case supports its claim.
In McIntyre the Supreme Court held a statute prohibiting anonymous leaflets violated the First Amendment. The Court noted Ohio's Elections Code contained detailed prohibitions against making false statements. 514 U.S. at 349, 115 S.Ct. 1511. Therefore the State asserts McIntyre impliedly suggested laws prohibiting false political statements are constitutional.
However the inference to be drawn from McIntyre is just the opposite. McIntyre explained that speech made in the heat of a political contest receives more protection than any other form of political speech. Id. at 347, 115 S.Ct. 1511. The state in McIntyre argued the speech restrictions were necessary because false advertising might be distributed as "an eleventh-hour anonymous smear campaign." Id. at 353 n. 16, 115 S.Ct. 1511. The Court explained the statute could not be upheld on that ground because it swept within it speech unrelated to the state's concern. Id. Describing the statute's unconstitutional breadth, the Court distinguished between literature supporting or opposing candidates from referenda as "[a] public question clearly cannot be the victim of character assassination." Id. McIntyre indicates the State does not possess an independent right to determine truth and falsity in public issues.[9]
In Donohoe a judicial candidate made numerous allegedly false statements regarding incumbent judges. The Court disciplined the candidate claiming the State possessed a unique interest in maintaining the integrity of the judiciary. 90 Wash.2d at 180, 580 P.2d 1093. However the continuing viability of this precedent is questionable in light of more recent authority which prompted 1995 revisions to the Code of Judicial Conduct. See, e.g., Buckley v. Illinois Judicial Inquiry Bd., 997 F.2d 224 (7th Cir.1993). Justice Talmadge's concurrence quotes Burson v. Freeman, 504 U.S. at 199-200, 112 S.Ct. 1846, to suggest the State possesses a compelling interest in "ensuring the integrity of the electoral process." Concurrence (Talmadge, J.) at 21. However, Burson is distinguishable as the statute there dealt with whether campaign materials could be displayed near the entrance to a polling place. The Court did not find a compelling interest to allow the State to determine the truth and falsity of political speech on campaign issues. Moreover, the false statements in Donohoe were directed at another candidate, not statements in an initiative campaign as is the case here.
Additionally, even if the State possessed a compelling interest here, it must also prove the statute at issue is necessary to serve that interest. Burson, 504 U.S. at 199-200, 112 S.Ct. 1846. However, the record here demonstrates RCW 42.17.530(1)(a) may be manipulated by candidates to impugn the electoral process rather than promote truthfulness.
Ultimately, the State's claimed compelling interest to shield the public from falsehoods during a political campaign is patronizing and paternalistic.[10]See Eu v. San Francisco *699 County Democratic Cent. Comm., 489 U.S. 214, 223-24, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989); Brown, 456 U.S. at 61, 102 S.Ct. 1523. It assumes the people of this state are too ignorant or disinterested to investigate, learn, and determine for themselves the truth or falsity in political debate, and it is the proper role of the government itself to fill the void. This assumption is especially flawed in cases like this where the truth of the assertion may be readily tested against the text of the initiative. At its worst the statute is pure censorship, allowing government to undertake prosecution of citizens who, in their view, have abused the right of political debate.
We therefore conclude RCW 42.17.530(1)(a) chills political speech, usurps the rights of the electorate to determine the merits of political initiatives without fear of government sanction, and lacks a compelling state interest in justification.

IV. Conclusion
The First Amendment to the United States Constitution renders RCW 42.17.530(1)(a) facially unconstitutional. The ACLU is awarded its reasonable attorney fees pursuant to 42 U.S.C.1988 and the 119 Vote No! Committee is awarded its reasonably attorney fees pursuant to RCW 42.17.400(5).
DOLLIVER and SMITH, JJ., concur.
GUY, Justice, concurring.
The judiciary has the duty to be vigilant in protecting citizens from laws that chill political speech. Calculated lies are not protected political speech. The elected representatives of the people have a right to pass laws which make malicious lying illegal in political campaigns; we have no constitutional duty to strike down such laws. The statute before us requires actual malice regarding a false statement of material fact, and requires that such malice and materiality be proved in a court of law by clear and convincing evidence. RCW 42.17.530(2). I have an abiding belief in the value of "uninhibited, robust, and wide-open" debate on public issues. New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Intentional, malicious lies do not foster debate; they foster deception and manipulation of the voting public.
I agree with the majority and Justice Talmadge's concurrence that the advertisement before us from the 119 Vote No! Committee does not violate RCW 42.17.530(1)(a). I disagree with the majority and Justice Madsen's concurrence that the statute on its face violates the First Amendment.
DURHAM, C.J., concurs.
MADSEN, Justice, concurring.
I agree with the majority that RCW 42.17.530 is facially unconstitutional because it sweeps protected First Amendment activity within its provisions by penalizing political speech, even if knowingly false, regarding an initiative measure. I write separately to emphasize that I am not convinced that the same is true where a statement contains deliberate falsehoods about a candidate for public office. In my view, there is merit to the contention that the Legislature may constitutionally penalize sponsorship of political advertising of such a nature by enacting a narrower statute than RCW 42.17.530.
In New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964), the Court held that under the First and Fourteenth Amendments a public official is prohibited from "recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice'that is, with knowledge that it was false or with reckless disregard of whether it was false or not." The Court soon refined the "official conduct" rule to include "anything which might touch on an official's fitness for office." Garrison v. Louisiana, 379 U.S. 64, 77, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), overruled on other grounds by Curtis Publ'g Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). The New York Times rule, the Court said, is "based on a recognition that the First Amendment guarantee of a free press is inevitably in tension with state libel laws designed to secure society's interest in the protection of individual *700 reputation." Monitor Patriot Co. v. Roy, 401 U.S. 265, 270, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971). This interest in reputation is what distinguishes speech concerning an initiative measure, which the majority correctly holds is protected even if knowingly false, and speech regarding individuals.
In Monitor Patriot, the Court held that the New York Times rule applies in the case of statements criticizing a candidate for public office. "[I]t is abundantly clear that ... publications concerning candidates must be accorded at least as much protection under the First and Fourteenth Amendments as those concerning occupants of public office." Id. at 271, 84 S.Ct. 710;[1]see also Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971) (holding that plaintiff in capacity as candidate for county tax assessor was public official for purposes of New York Times rule in defamation action against newspaper which published false story that he had been indicted for perjury in a civil rights suit); Brown v. Herald Co., 698 F.2d 949 (8th Cir.1983) (candidate running for office of sheriff is public official subject to New York Times rule). The Court reasoned: "[I]f it be conceded that the First Amendment was `fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people,' Roth v. United States, 354 U.S. 476, 484[, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957)], then it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." Monitor Patriot, 401 U.S. at 271-72, 91 S.Ct. 621.
The Court's decisions in New York Times and Monitor Patriot, and other cases, have primarily addressed the extent to which speech is protected. The other side of the coin, of course, is that where the actual malice standard is met, speech may subject the speaker to pay damages without running afoul of the First Amendment. Thus, statements about candidates for public office made with actual knowledge of falsity or with reckless disregard of whether they are true or false are not protected under the First and Fourteenth Amendments. A state, in short, may allow recovery of damages for defamation to public officials, including candidates for public office, provided that the New York Times actual malice standard is satisfied. Accordingly, although there is no case directly on point, it is reasonable to contend that the Legislature could enact a law prohibiting a person from sponsoring with actual malice political advertising containing false statements of material fact about a candidate for public office.
We need not, however, decide that issue because where an initiative measure is involved, as in this case, the First Amendment does not permit governmental censorship of political speech. There must be no impediment to free and open debate regarding such issues. For unlike the case where the societal interest in individual reputations is at stake, there is no competing interest sufficient to override our precious freedom to vigorously debate the wisdom of enacting a measure, even if that debate contains falsehoods as well as truths.[2] The voters in this *701 state are able to make an informed choice based upon freely advanced competing ideas, sorting the wheat from the chaff, and can compare what they hear and read with the text of a proposed measure.
ALEXANDER, J., concurs.
TALMADGE, Justice, concurring.
Today the Washington State Supreme Court becomes the first court in the history of the Republic to declare First Amendment protection for calculated lies. In so doing, the majority opinion flouts numerous United States Supreme Court pronouncements to the contrary. The majority determines RCW 42.17.530, a statute providing penalties for dissemination of false political advertising, is facially violative of the First Amendment because the State has no compelling interest in preventing lies in the course of an initiative or referendum campaign, no matter how egregious the lies may be.
The sweep of the majority's rhetoric is so encompassing that no statute designed to ensure statements of fact in political campaigns are truthful would survive a First Amendment challenge. Moreover, the breadth of the majority's rhetoric has untold impacts on existing law regarding political campaigns for candidates and ballot measures.
The majority is also shockingly oblivious to the increasing nastiness of modern American political campaigns. This trend is highlighted by a "win at any cost" attitude involving vilification of opponents and their ideas. This new type of campaign neither illuminates nor exemplifies the best of our democratic tradition, and has caused too many of our fellow citizens to turn away from participation in the political process.
While I believe the First Amendment properly presents extraordinarily difficult hurdles for statutes addressing political speech and conduct, I cannot agree RCW 42.17.530 violates the First Amendment. However, because I believe the 119 Vote No! Committee (Committee) did not violate RCW 42.17.530(1)(a), I concur in the majority's disposition of the case.

ANALYSIS
In view of the majority's pioneering foray into uncharted First Amendment territory, one might expect an extensive legal discussion explaining what new and original insights led it to this understanding. Instead, the majority opinion consists largely of a collage of quotes extolling the virtues of free speech, propositions with which no one disagrees, and then concludes summarily the challenged statute fails the First Amendment test. Given the uniqueness of the majority's conclusion, more rigorous constitutional analysis is certainly required.
A. Standard of Review
The issue at bar has reached us on cross-motions for summary judgment. We decide appeals from summary judgments de novo. Because this case involves a First Amendment challenge to a statute regulating the content of speech, we presume the statute is unconstitutional, and subject the statute to strict scrutiny. Collier v. City of Tacoma, 121 Wash.2d 737, 748-49, 854 P.2d 1046 (1993).
B. Constitutionality of RCW 42.17.530
The majority cites only a small portion of the challenged statute, Majority op. at 694, and undertakes no analysis of the wording of the statute. Thus, one must guess as to the constitutional infirmities the majority claims exist. The majority tells us the State may not prohibit "unpalatable" speech. Majority op. at 695. But the statute addresses only lies, not vitriol. The majority tells us the State may not silence criticism of the government. Id. But the statute addresses only calculated falsehoods, not censure. The majority tells us the State may not chill uninhibited political debate. Majority op. at 695. But the statute addresses only malicious prevarication, not honest, robust, political debate. The majority tells us factual *702 blunders are best corrected by the opponent. Majority op. at 696. But the statute addresses deliberate falsehoods, not innocent errors of fact.[1]
The key to the majority's analysis of the statute is found in the following two sentences: "The State asserts it may prohibit false statements of fact contained in political advertisements. The claim presupposes the State possesses an independent right to determine truth or falsity in political debate." Majority op. at 695. The majority thus presumes the people of Washington have no authority to require persons to tell the truth. This presumption is, of course, wrong. Perjury has been a part of Washington's criminal code since territorial days. See Ch. 9A.72 RCW. Prohibitions against lying and bearing false witness may be found in cultures worldwide from time immemorial. See Richard H. Underwood, False Witness: A Lawyer's History of the Law of Perjury, 10 ARIZ. J. INT'L & COMP. L. 215 (1993), for a comprehensive survey of prohibitions against lying.
Although perjury itself concerns lying under oath or in official proceedings, there is no reason the State may not prohibit lying in other contexts pursuant to the exercise of its police power. That is precisely what the State has done by enacting the challenged statute in this case.
The challenged statute is plainly a valid exercise of the police power. Lawton v. Steele, 152 U.S. 133, 137, 14 S.Ct. 499, 38 L.Ed. 385 (1894); State v. Crediford, 130 Wash.2d 747, 752, 927 P.2d 1129 (1996) (quoting State v. Brayman, 110 Wash.2d 183, 193, 751 P.2d 294 (1988), which in turn quoted State v. Conifer Enters., Inc., 82 Wash.2d 94, 96-97, 508 P.2d 149 (1973)). If the elected representatives of the people of Washington, who are accountable to their constituents every two and four years, in their considered judgment believe calculated lying does not belong in electoral politics, it is not for us to question the wisdom of or necessity for such legislation.
Turning to the First Amendment, the threshold question is whether the statute affects speech over which the First Amendment affords protection. Without examining the wording or effect of the statute, the majority simply assumes protected speech is involved. Subsuming the answer in the question falls a good way short of the penetrating rigor a legitimate constitutional analysis requires. We start with the wording of the statute.
Before 1988, RCW 42.17.530 read:
A person shall not sponsor political advertising which contains information that the person knows, or should reasonably be expected to know, to be false. No political advertising may falsely represent that a candidate is an incumbent for the office sought. A person or candidate shall not make, either directly or indirectly, a false claim stating or implying the support or endorsement of any person or organization.
In Laws of 1988, ch. 199, § 2, the Legislature replaced that language with the following:
(1) It is a violation of this chapter for a person to sponsor with actual malice:
(a) Political advertising that contains a false statement of material fact;
(b) Political advertising that falsely represents that a candidate is the incumbent for the office sought when in fact the candidate is not the incumbent;
(c) Political advertising that makes either directly or indirectly, a false claim stating or implying the support or endorsement of any person or organization when in fact the candidate does not have such support or endorsement.
(2) Any violation of this section shall be proven by clear and convincing evidence.
The new statute now requires actual malice before a violation may be found. In Laws of 1988, ch. 199, § 1, now codified as RCW 42.17.505(1), the Legislature defined actual malice to mean "to act with knowledge of falsity or with reckless disregard as to truth or falsity." By requiring the intermediate standard of proof, clear and convincing evidence, the new statute made violations more *703 difficult to prove. Thus, a person violates the statute if and only if he or she sponsors political advertising that is (1) a false statement of material fact (2) with actual malice, as defined, and (3) is found to have done so by clear and convincing evidence. One example of a violation of this statute might be a political flyer from a candidate who declares herself to be the incumbent when in fact she is not. She has acted with "knowledge of falsity."[2] Another example could be one candidate's accusing an opponent of having been convicted of desertion during the Vietnam War. In a case such as this, the accuser may have no actual knowledge one way or the other, but has violated the statute by acting with "reckless disregard as to the truth or falsity" of the accusation. These examples are what men and women of common understanding would describe as deliberate lies. Do deliberate lies come under the protective umbrella of the First Amendment? The majority opinion says "yes." The Supreme Court of the United States has said "no" on numerous occasions, as have all other courts addressing the same question.
The Supreme Court has unequivocally and repeatedly refused to extend First Amendment protection to deliberate lies. The Court said in Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964):
The use of calculated falsehood, however, would put a different cast on the constitutional question. Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity. At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. Cf. Riesman, Democracy and Defamation: Fair Game and Fair Comment I, 42 COL. L. REV. 1085, 1088-1111 (1942). That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality...." Chaplinsky v. New Hampshire, 315 U.S. 568, 572[, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942)]. Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.
These were the words of Justice Brennan, certainly not one disposed to limit First Amendment freedoms.
Ten years later, in Gertz v. Robert Welch, Inc., 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court reiterated: "But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in `uninhibited, robust, and wide-open' debate on public issues," citing New York Times, 376 U.S. at 270, 84 S.Ct. 710. And, in Brown v. Hartlage, 456 U.S. 45, 59, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982), the Court said, "Of course, demonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements." Accord Herbert v. Lando, 441 U.S. 153, 171, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) ("Spreading false information in and of itself carries no First Amendment credentials."), cited with approval by Bill Johnson's Restaurants, Inc. v. National Labor Relations Bd., 461 U.S. 731, 743, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) ("false statements are not immunized by the First Amendment right to freedom of speech"); Rosenbloom v. *704 Metromedia, Inc., 403 U.S. 29, 52, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) ("Calculated falsehood, of course, falls outside `the fruitful exercise of the right of free speech,'" citing Garrison, 379 U.S. at 75, 85 S.Ct. 209); Time, Inc. v. Hill, 385 U.S. 374, 389-90, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) ("But the constitutional guarantees can tolerate sanctions against calculated falsehood without significant impairment of their essential function. We held in New York Times that calculated falsehood enjoyed no immunity in the case of alleged defamation of a public official concerning his official conduct."); St. Amant v. Thompson, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) ("Neither lies nor false communications serve the ends of the First Amendment."); Linn v. United Plant Guard Workers of Am., Local 114, 383 U.S. 53, 63, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) ("[T]he most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth."); Vanasco v. Schwartz, 401 F.Supp. 87, 93 (S.D.N.Y.1975) ("[W]e can agree with the Board's argument that calculated falsehoods are of such slight social value that no matter what the context in which they are made, they are not constitutionally protected."), aff'd, 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976). See also Riley v. National Fed'n of the Blind of North Carolina, Inc., 487 U.S. 781, 803, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (Scalia, J., concurring in part, concurring in judgment) ("Where core First Amendment speech is at issue, the State can assess liability for specific instances of deliberate deception."); Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 301, 91 S.Ct. 632, 28 L.Ed.2d 57 (1971) (White, J., concurring) ("Misinformation has no merit in itself; standing alone it is as antithetical to the purposes of the First Amendment as the calculated lie.").
We have been no less vociferous in denouncing the calculated lie in the campaign context:
[W]e do not believe that the First Amendment protects one who utters a statement with knowledge of its falsity, even in the context of a judicial campaign. Such speech is not beneficial to the public and is generally harmful to the person against whom it is directed. The only beneficiary of the comment is the utterer thereof. On balance, such statements are not deserving of constitutional protection.
In re Donohoe, 90 Wash.2d 173, 181, 580 P.2d 1093 (1978). We have not overruled this case by amending the Code of Judicial Conduct, as the majority asserts. Majority op. at 697. Nevertheless, the majority's analysis calls into question the analysis of our own canons of judicial conduct. In Donohoe, a candidate for a judicial office deliberately altered campaign letters sent on behalf of her opponent in a fashion this Court described as "reprehensible and a fraud upon the voting public." Donohoe, 90 Wash.2d at 184, 580 P.2d 1093.
Likewise, in In re Kaiser, 111 Wash.2d 275, 759 P.2d 392 (1988), a judicial candidate suggested his opponent's support came from "drunk driving defense attorneys" and this Court found such statements were false. In Kaiser, we specifically noted that political candidates, including judicial candidates, have rights of free speech, notwithstanding their participation in the judicial campaign process. But we also said, "We issued two reprimands in Donohoe, however, because we recognized that free speech guaranties do not extend far enough to protect falsehood." Kaiser, 111 Wash.2d at 284, 759 P.2d 392.
Other state courts have agreed with our prior holdings: Fellows v. National Enquirer, Inc., 211 Cal.Rptr. 809, 824 (Cal.App. 1985) ("[A] publisher of what the Supreme Court has termed a `calculated falsehood' ... enjoys no constitutional protection." (Citations omitted)), rev'd on other grounds, 42 Cal.3d 234, 721 P.2d 97, 228 Cal.Rptr. 215, 57 A.L.R.4th 223 (1986); Long v. State, 622 So.2d 536, 537 (Fla.App.) ("The use of calculated falsehoods under any circumstances, even in the criticism of public officials, is not constitutionally protected."), review denied, 629 So.2d 133 (Fla.1993); Thibadeau v. Crane, 131 Ga.App. 591, 206 S.E.2d 609, 610 (1974) ("There is no privilege protecting the use of calculated falsehood."); People v. Duryea, 76 Misc.2d 948, 351 N.Y.S.2d 978, 988 (N.Y.Sup.Ct.1974) ("Calculated falsehood is never protected by the First Amendment."); People v. Bloss, 27 Mich.App. 687, 184 *705 N.W.2d 299, 311 (1970) ("We see no difference constitutionally between the calculated falsehood and the calculated appeal to prurient interest. Neither is a communication of ideas entitled to constitutional protection."), rev'd on other grounds, 388 Mich. 409, 201 N.W.2d 806 (1972); Theckston v. Triangle Publications Inc., 100 N.J.Super. 452, 242 A.2d 629, 631 ("Speech concerning public affairs is the essence of self-government so that, where public officials are concerned, it is only the calculated falsehood which will afford redress."), cert. denied, 393 U.S. 1001, 89 S.Ct. 486, 21 L.Ed.2d 466 (1968); State v. Powell, 114 N.M. 395, 839 P.2d 139, 142 (1992) ("[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.").
Despite the mountain of United States Supreme Court and state court authority to the contrary, the majority decides the First Amendment condones deliberate falsehoods in campaigns. As support for its position, the majority cites to New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964), on four separate occasions. Yet nowhere does the majority opinion reveal the holding of New York Times, which is "a public official cannot recover for defamation unless he or she establishes the defendant made the defamatory statement with actual malice, that is, knowledge of its falsity or with reckless disregard for whether it was false or not." Richmond v. Thompson, 130 Wash.2d 368, 376, 922 P.2d 1343 (1996). The new RCW 42.17.530(1)(a), having added actual malice as a required element of the violation and having adopted from New York Times the exact language defining "actual malice," plainly passes muster under that case. Similarly, the new statute's requirement of clear and convincing evidence mirrors the requirement for the higher standard of proof set forth in Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). How, then, can a statute on all fours with controlling United States Supreme Court authority be unconstitutional in Washington? As long as New York Times remains the supreme law of the land, we are not free to ignore it, or to interpret it to our liking, short of articulating independent state grounds for doing so under the Washington constitution. Nobody has made such an argument in this case. The United States Supreme Court would not find RCW 42.17.530(1)(a) unconstitutional under its First Amendment jurisprudence. Nor may we. See WASH. CONST. art I, § 2 ("The Constitution of the United States is the supreme law of the land.").
The Court's holding in New York Times and its repeated refusals to grant First Amendment protection to lies are completely dispositive of the issues in this case. The majority is undeterred by authority, however, and finding no case extending First Amendment protection to deliberate lies in political campaigns, asserts a novel proposition to support its conclusion: the majority decides that everything the Supreme Court said in New York Times, Garrison, and Gertz concerning deliberate lies is applicable only to defamation cases, and not to ballot issues that, because they do not involve individuals, are not susceptible to defamation actions. The Supreme Court itself has never indicated such a dichotomy exists, nor has any other court in any other jurisdiction.
The majority takes its cue from intervenor American Civil Liberties Union (ACLU), which cited in its brief a law review article by former Harvard Law School Professor Charles Fried. Fried writes: "In political campaigns the grossest misstatements, deceptions, and defamations are immune from legal sanction unless they violate private rightsthat is, unless individuals are defamed." Charles Fried, The New First Amendment Jurisprudence: A Threat to Liberty, 59 U. CHI. L. REV. 225, 238 (1992). Then-Professor Fried did not discuss the rationale for his assertion; nor is it the central or even the peripheral subject of his law review article. He did not discuss New York Times, or Gertz, or Garrison in the context of his statement. Nor did he suggest calculated lying has a legitimate role in American politics. Fried's bare assertion has the effect of a throwaway line. No other court has adopted his proposition; indeed, I can find none that has even discussed it. Although the article in which the statement appears has been cited many times in the scholarly *706 literature for other reasons, the statement itself has gone largely unnoticed in the five years since it was published, except by the ACLU. On such flimsy authority, the majority suggests we ignore all the Supreme Court pronouncements to the contrary and hold the First Amendment protects calculated falsehoods.
Professor Fried is flat wrong. Numerous laws affecting First Amendment rights intended to protect the integrity of the electoral process itself, and not just private dignitary rights, have been upheld. The leading example is Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). There, the Court upheld federal statutory limitations on political contributions and requirements that candidates disclose the sources of their campaign funding against First Amendment challenges. Buckley had nothing to do with reputational interests, yet the Court upheld restrictions on First Amendment activities.
Other examples of constitutional restrictions on First Amendment rights that do not involve reputational interests abound. For example, in Washington, it is a gross misdemeanor on the day of a general or special election to "[s]uggest or persuade or attempt to suggest or persuade any voter to vote for or against any candidate or ballot measure" within 300 hundred feet of the entrance to a polling place. RCW 29.51.020(1)(a), (5). This prohibition implicates several First Amendment rights: the right of association, the right to travel, and the right to engage in political speech. Political advocacy may perhaps be the quintessential value the First Amendment protects. Nevertheless, the United States Supreme Court has upheld the constitutionality of such electioneering laws. Burson v. Freeman, 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (upholding Tennessee statute prohibiting the solicitation of votes and display of campaign materials within 100 feet of a polling place).
In summary, there are numerous valid restrictions on the content of speech that do not involve personal, reputational interests. Fried was wrong, and the majority is wrong in basing its conclusion solely on Fried's unanalyzed statement.
Thus, the majority holds that in political campaigns involving ballot issues the deliberate lie must receive First Amendment protection. Given the majority's analysis, the language cited above from Garrison would read:
For the use of the known lie as a tool is not at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which "are an essential part of any exposition of ideas, and are of such great social value as a step to truth that their benefits support the social interest in order and morality...." Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031. Hence the knowingly false statement and the false statement made with reckless disregard of the truth ... enjoy constitutional protection.
I could not disagree more. I discern no benefit whatsoever to our treasured democracy from use of the calculated lie in electoral politics, and cannot conceive the First Amendment protects it.
Most recently, in McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), the United States Supreme Court struck down Ohio's statutory prohibition against distribution of anonymous campaign literature in a ballot measure campaign as violative of the First Amendment. However, the Court did not categorically hold that any statute addressing deliberately false statements in a ballot measure campaign violated the First Amendment per se. The Court recognized that Ohio's statutory prohibition on anonymous leaflets was not the state's principal weapon against campaign fraud. The Court noted the Ohio Election Code included statutory provisions providing detailed and specific prohibitions against making or disseminating false statements during political campaigns. The Court impliedly approved such specific prohibitions, describing them "as a deterrent to the making of false statements by unscrupulous prevaricators."[3]
*707 The chilling effect of the statute on free speech is infinitesimal, if it exists at all. The scope of RCW 42.17.530(1)(a) is severely proscribed. It does not reach hyperbole or rhetoric, polemic or beguiling commentary, satire or mockery, zealotry or insanity, insincerity or low cunning, true beliefs or mere mistakes.[4] It does not concern itself with opinion or political position. The communists, the fascists, the socialists, the New Democrats, the Old Democrats, the moderate Republicans, the radical right Republicans, the liberals, the Luddites, the conservatives, the Christian Coalition, the Reform Party, the Socialist Workers Party, the Wobblies, the Webeloes, the cranks, the crackpots, the naive, the foolish, the property rights advocates, the environmentalists, the Tsarists, the monarchists, the anarchists, the disgruntled, the Sandanistas, the survivalists, the Ku Klux Klan, the America Firstersall have nothing to fear from the law.
The statute speaks to only one person: the calculating liar, who with clear mind and steadfast, deliberate purpose, coldly composes and diligently distributes knowing lies to effect a desired political result. The statute chills only this devious liar, not free speech. In short, "The actual malice test penalizes only the `calculated falsehood.'" Tavoulareas v. Washington Post Co., 567 F.Supp. 651, 657 (D.D.C.1983) (citing Garrison, 379 U.S. at 73-75, 85 S.Ct. 209), aff'd in part, rev'd in part sub nom. Tavoulareas v. Piro, 759 F.2d 90 (D.C.Cir.1985). I agree with Justice Brennan writing in Garrison that the First Amendment does not protect the deliberate lie. Accordingly, I do not find RCW 42.17.530(1)(a) facially unconstitutional.[5]
C. Compelling State Interest
Because I conclude calculated lies are not protected speech under the First Amendment, it is not necessary to address the second question, which is, does the state have a compelling interest in prohibiting calculated lies in political campaigns. Nevertheless, I address it because the majority implies the State does not have a compelling interest in *708 preserving the sanctity of the electoral process.
We require a compelling governmental interest for regulation of protected speech in a public forum, Bering v. Share, 106 Wash.2d 212, 236, 721 P.2d 918 (1986), and political speech is scrupulously protected. Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); Young Americans for Freedom, Inc. v. Gorton, 83 Wash.2d 728, 522 P.2d 189 (1974).
Do the people of Washington have a compelling interest in penalizing deliberate lies in political campaigns? The answer is obvious. The United States Supreme Court said in Burson v. Freeman, 504 U.S. 191, 199-200, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992):
Accordingly, this Court has concluded that a State has a compelling interest in protecting voters from confusion and undue influence. See Eu, 489 U.S., at 228-229[, 109 S.Ct., at 1023].
The Court also has recognized that a State "indisputably has a compelling interest in preserving the integrity of its election process." Id., at 231 [, 109 S.Ct., at 1024]. The Court thus has "upheld generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." Anderson v. Celebrezze, 460 U.S. 780, 788, n. 9 [, 103 S.Ct. 1564, 1570, n. 9, 75 L.Ed.2d 547] (1983) (collecting cases). In other words, it has recognized that a State has a compelling interest in ensuring that an individual's right to vote is not undermined by fraud in the election process.
The State has a compelling interest in ensuring the integrity of the electoral process, for ballot measures as well as for election of candidates. That compelling interest includes punishing calculated deceit and knowing lies.
A distressing feature of the majority's analysis is its fundamental lack of any connection with the real world of political campaigns. Its entire answer to any concerns about an electoral process flowing from deliberate lies is that more speech will cure such falsehoods. I wish this were true, and, in the best of all possible worlds, it could be. But, in modern American politics, it isn't reality. It is indeed all too common for candidates, political committees and individuals in political campaigns to make last minute charges, usually distributed the weekend before election day or in a fashion calculated to forestall a reply through whatever means at their disposal. There is simply no time to use any of the traditional means of political communicationleaflets, direct mail, newspaper, radio or television advertisingto combat late hour, outrageously false statements. Further speech, in the classic formulation, will not cure such a situation. Texas v. Johnson, 491 U.S. 397, 419, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (more speech, not enforced silence, cures false speech). As the United States Supreme Court in Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 n. 9, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), stated: "[A]n opportunity for rebuttal seldom suffices to undo harmful defamatory falsehood. Indeed the law of defamation is rooted in our experience that the truth rarely catches up with the lie."
Ironically, in the case of defamation in a campaign involving candidates, the remedies for such conduct may actually be greater than those available to address outright lies in a ballot measure campaign. A defamed candidate has a cause of action in court. That candidate may also suggest to the legislative body that the offending candidate should not be seated. See WASH. CONST. art. II, § 8 ("Each house shall be the judge of the election, returns and qualifications of its own members...."). That candidate could even challenge the offender in the next election. By contrast, the ballot measure enacted on the basis of a campaign of lies may be amended only by a two-thirds vote of the Legislature for the period of two years after its enactment. WASH. CONST. art. II, § 41 (amend. 26). Few legislators would choose to risk proposing the repeal of a popularly enacted measure, let alone two-thirds of all legislators necessary for such repeal, to express antagonism to a campaign flawed by deliberate lies.
American political campaigns in general and campaigns in the State of Washington have become all too often campaigns of vilification and mudslinging, rather than campaigns *709 of communication. While this has been true throughout the course of American history,[6] the sophistication of recent political campaigns coupled with the ability of the media to reach so many so quickly have only enhanced the power of last minute campaign smears. Moreover, money talks in elections. If the victim is without significant campaign resources, the "Big Lie" technique can, unfortunately prevail over the truth. All too many of our fellow citizens, turned off by these kinds of political maneuvers, have turned away from the political system, expressing indifference to the extreme tactics taken by partisans of candidates or issues.[7]
Because of the foregoing realities of modern electoral politics, the State Legislature was justified in declaring a compelling interest in ensuring that at least a modicum of propriety be observed in political campaigns, that modicum being honesty. In particular, the State has a compelling interest to ensure no deliberately false statements of fact are disseminated in the course of a campaign involving candidates or ballot measures. The majority would destroy any statutory effort to prohibit deliberate falsehoods in campaigns or, for that matter, disclosure of information to the public regarding adherence to campaign ethics standards. With this, the majority sends out the wrong message to a public troubled by rampant problems in the campaign process while it condones lies in ballot measure campaigns as constitutionally protected, leaving our society powerless to take the most minimal steps to stop them. Unlike the majority, I am unwilling to find, as a matter of First Amendment principles, that any and all lies, no matter how egregious, are constitutionally protected in ballot measure campaigns.
The majority considers invocation of society's interest in campaign integrity "patronizing and paternalistic." This is a novel approach to constitutional analysis. We have no authority to strike down legislation because we consider it to be patronizing and paternalistic. No constitutional standard of review with which I am familiar encompasses those terms. I consider it remarkably patronizing to claim the people of Washington have no compelling interest in preventing political campaigns from being corrupted by deliberate liars.
Were we to adopt the sweeping scope of the First Amendment in political campaigns advocated by the majority here (the State has no compelling interest in ensuring the sanctity of the electoral process because such concern is patronizing and paternalistic), any statute regulating the campaign process would fail. It is difficult to discern how public disclosure of contributions or expenditures would stand a First Amendment challenge in light of the majority's notion that the State has no compelling interest in the integrity of the campaign process. Yet we have held it does. Fritz v. Gorton, 83 Wash.2d 275, 301, 517 P.2d 911 (1974) ("it is within the power of the people to prescribe informational standards or disclosure qualifications relative to public office").
Moreover, the specific provisions of RCW 42.17.530 not at issue in this case would similarly be subject to attack. RCW 42.17.530(1)(b) prohibits political advertising that falsely represents a candidate is the incumbent for an office sought when in fact the candidate is not the incumbent. Similarly, RCW 42.17.530(1)(c) prohibits advertising that directly or indirectly suggests a person has been endorsed or supported by an organization or person when the candidate has no such support or endorsement.[8] To use the majority's analysis, deliberately false statements concerning incumbency or concerning *710 endorsements do not involve defamatory conduct with respect to another candidate, but rather impugn the integrity of the process. The State does, in fact, have a compelling interest in ensuring political campaigns are conducted within some bounds of propriety and within the bounds of the public's need for appropriate information about the issues and sponsors of such issues.[9]
In summary, the First Amendment does not protect calculated lies. Moreover, the people of Washington have a compelling interest in preventing such lies in electoral campaigns. I would uphold the facial constitutionality of RCW 42.17.530(1)(a).
D. Application of RCW 42.17.530
Having found the statute constitutional, I next address whether it was violated. The trial court correctly determined the 119 Vote No! Committee did not violate RCW 42.17.530 because the Committee engaged in traditional political campaign hyperbole in the campaign against Initiative 119. The Committee distributed a leaflet with statements of opinion regarding the contents of the proposed law; those opinions did not constitute facts within the meaning of the statute.
The statute does not purport to define "a material fact" in the context of a political campaign or determine whether the campaign involves a candidate or a ballot measure. An opinion is not subject to the statute's reach, as the deputy attorney general for the Public Disclosure Commission (PDC) conceded in oral argument. Prior decisions of Washington courts have indicated whether a statement or communication is a fact or opinion is a question of law for the court; the court should consider the entire communication, not particular portions of it, the degree to which the truth or falsity of a statement can be objectively determined without resort to speculation, and whether ordinary persons hearing or reading the statement or communication receive it as an expression of opinion rather than a statement of fact in analyzing the existence of a fact or opinion. Benjamin v. Cowles Publ'g Co., 37 Wash.App. 916, 922-23, 684 P.2d 739, review denied, 102 Wash.2d 1018 (1984); Camer v. Seattle Post-Intelligencer, 45 Wash.App. 29, 39-40, 723 P.2d 1195 (1986), review denied, 107 Wash.2d 1020, cert. denied, 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 677 (1987); Hoppe v. Hearst Corp., 53 Wash.App. 668, 671-73, 770 P.2d 203 (1989).
In construing a similar statute, Oregon courts have consistently held that a statement that can in any way be inferred to be either factually correct or a mere opinion is not prohibited by Oregon's statute, even though it could also be interpreted as a false factual statement. See, e.g., Committee of One Thousand to Re-Elect State Senator Walt Brown v. Eivers, 296 Or. 195, 674 P.2d 1159, 1164 (1983). The Oregon standard is a very difficult one to establish, but still provides that factually false statements may be actionable.
In light of the First Amendment issues present in the political campaign context whether a campaign by candidates or a campaign by ballot measureand the benefits of robust political discussion, I would adopt the standard for opinion and fact articulated in Benjamin and Hoppe with the additional refinement of the Oregon courts.[10]
Turning to the facts in this case, the trial court held as a matter of law the statements made by the Committee were not statements of material fact, but rather involved *711 the effect or meaning of the proposed law and, therefore, were more in the nature of opinions rather than factual statements:
As commonly understood, facts do not include comments regarding the contents of laws of [sic] their interpretations. Statements about the effect or meaning of law are other-than-fact, are a matter of law and are determined by judicial opinion.
Clerk's Papers at 274. I agree with the trial court.
The leaflet here stated Initiative 119 would permit doctors to end patients' lives "without safeguards," arguing the Initiative did not specify special qualifications for physicians under the Initiative, rules against coercion of patients, reporting requirements for when the authority under the Initiative was exercised, notification requirements for family members, or special protections for vulnerable individuals. These concerns relate particularly to the operation or effect of the law. As the PDC indicates in its brief, these statements are often far beyond the actual text of the Initiative. PDC Br. at 9-12.
However, these statements are debatable assertions of opinion regarding the impact of the Initiative from the perspective of the Initiative's opponents, who believed the Initiative went too far in allowing physician-assisted suicide and did too little to protect individuals subject to its authority.
Political campaigns are communications exercises and often involve heated debate rife with hyperbole that pushes the truth to its edge. The Committee's statements in its leaflet were statements of opinion about the effect of the proposed law. They were sufficiently debatable to fall within the wide latitude this Court has traditionally given to political speech.[11]
In 1938, the Wisconsin Supreme Court considered a state statute prohibiting the publishing of false representations pertaining to a candidate or referendum.[12] I wholeheartedly agree with the following statement by that court:
Nothing is more important in a democracy than the accurate recording of the untrammeled will of the electorate. Gravest danger to the state is present where this will does not find proper expression due to the fact that electors are corrupted or are misled.... It is ... possible and feasible to require of candidates that statements of fact known to be false and so substantially bearing upon the fitness of other candidates as to have a tendency to influence votes shall not be made the basis of appeals for votes.
State ex rel. Hampel v. Mitten, 227 Wis. 598, 607, 278 N.W. 431 (1938). To achieve the "accurate recording of the untrammeled will of the electorate," the First Amendment can indeed "tolerate sanctions against calculated falsehood." Time, Inc., 385 U.S. at 389-90, 87 S.Ct. 534.

CONCLUSION
The trial court's judgment that RCW 42.17.530 is not facially unconstitutional and that the Committee did not violate the statute should be affirmed.
JOHNSON, J., concurs.
NOTES
[1] The leaflet stated in pertinent part:

Initiative 119: Vote No
IT WOULD LET DOCTORS END PATIENTS' LIVES WITHOUT BENEFIT OF SAFEGUARDS...
 No special qualifications
your eye doctor could kill you.
 No rules against coercion
Nothing to prevent "selling" the idea to the aged, the poor, the homeless.
 No reporting requirements
No records kept.
 No notification requirements
Nobody need tell family members beforehand.
 No protection for the depressed
No waiting period, no chance to change your mind.
INITIATIVE 119 ... IS A DANGEROUS LAW
VOTE NO ON INITIATIVE 119
Clerk's Papers (CP) at 18.
[2] RCW 42.17.530 provides:

False political advertising
(1) It is a violation of this chapter for a person to sponsor with actual malice:
(a) Political advertising that contains a false statement of material fact;
(b) Political advertising that falsely represents that a candidate is the incumbent for the office sought when in fact the candidate is not the incumbent;
(c) Political advertising that makes either directly or indirectly, a false claim stating or implying the support or endorsement of any person or organization when in fact the candidate does not have such support or endorsement.
(2) Any violation of this section shall be proven by clear and convincing evidence.
[3] The ACLU has standing to assert its claim on its own behalf. A statute that chills a plaintiff's speech grants standing to that plaintiff and presents a case ripe for adjudication. A plaintiff need not "expose himself to actual arrest or prosecution" to challenge a statute which deters the exercise of his constitutional rights. Steffel v. Thompson, 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). New York Civil Liberties Union, Inc. v. Acito, 459 F.Supp. 75, 81-82 (S.D.N.Y.1978) ("[The plaintiffs] contend that the existence of the statute, in its present form, leaves forever open the possibility of enforcement against them as well as other non-partisan, non-political groups ... The potential for such a situation, with its clear likelihood of causing chilling effects upon plaintiffs, leads us to conclude... that the ... questions are ripe for declaratory action.") (quoting American Civil Liberties Union, Inc. v. Jennings, 366 F.Supp. 1041, 1048 (D.D.C.1973)); Walker v. Munro, 124 Wash.2d 402, 416, 879 P.2d 920 (1994) ("In the First Amendment context, a `chilling effect' on First Amendment rights is a recognized present harm, not a future speculative harm, which allows third party standing when the law in question burdens constitutionally protected conduct.").

The ACLU engages in the support and opposition of referenda and initiatives, as attested to by the fact they publicly supported Initiative 119. ACLU Br. at 3 n.1. Thus, they themselves are presented with the choice of either risking prosecution under the statute or preemptively tempering their public advertisements concerning proposed initiatives. This Hobson's choice clearly grants standing to prosecute a declaratory action against the facial unconstitutionality of RCW 42.17.530(1)(a).
[4] The trial court also awarded attorney fees and costs to the ACLU under 42 U.S.C.1988 because the ACLU successfully prevailed on its claims that the Constitution does not permit the PDC to issue administrative restraints on political speech and that there must be a final determination on the merits before a court may restrain any political speech. The State does not appeal these determinations by the trial court.
[5] The ACLU may prosecute its complaint after the trial court dismissed the original, underlying suit. State v. Port of Peninsula, 89 Wash.2d 764, 767, 575 P.2d 713 (1978) (The court has "discretion to retain an intervenor's suit as a separate action, even if the main action falls.").
[6] Before ascending to the bench Chief Justice John Marshall publicly opposed the acts and pledged, if elected to Congress, that he would "indisputably oppose their revival" without regard to constitutionality. Jean Edward Smith, John Marshall, Definer of a Nation 244 (1996).
[7] The State attempts to bootstrap its compelling interest argument by claiming the interest is more compelling alleging the speech here is unprotected. As discussed earlier, RCW 42.17.530(1)(a) impacts protected speech and the discussion concerning compelling interest only further demonstrates this.
[8] Justice Talmadge's concurrence describes this statement as "flat wrong." Concurrence (Talmadge, J.) at 15. However, to support its claim the concurrence relies upon cases and statutes that are immaterial to Professor Fried's accurate analysis. Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) dealt with campaign finance; Burson v. Freeman, 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) dealt with polling place electioneering. RCW 29.51.020(1)(a) likewise deals with electioneering. What relevance any of these have to the point made by Professor Fried, and the issue in this case, is unclear. Certainly they have nothing to do with punishment of general, nonpersonal political statements the state decides are "misstatements, deceptions, and defamations."
[9] Additionally, the implication drawn by Justice Talmadge's concurrence at page 17 that "[t]he Court impliedly approved" statutory prohibitions against making false statements is thwarted by the Court's express statement declining to evaluate the constitutionality of the Ohio's antifraud provisions. McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 351, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995).
[10] Justice Talmadge's concurrence claims characterizing this statute as "patronizing and paternalistic" is a "novel approach to constitutional analysis." Concurrence (Talmadge, J.) at 25. However, we are not alone as the United States Supreme Court has adopted this "novel approach" as well. See Eu, 489 U.S. at 223, 109 S.Ct. 1013 (When the State "directly hampers the ability of a party to spread its message and hamstrings voters seeking to inform themselves about the candidates and the campaign issues," it has adopted a "highly paternalistic approach" by "limiting what people may hear...." This approach renders such a law constitutionally suspect.).
[1] The Court also recognized:

The principal activity of a candidate in our political system, his "office," so to speak, consists in putting before the voters every conceivable aspect of his public and private life that he thinks may lead the electorate to gain a good impression of him. A candidate who, for example, seeks to further his cause through the prominent display of his wife and children can hardly argue that his qualities as a husband or father remain of "purely private" concern. And the candidate who vaunts his spotless record and sterling integrity cannot convincingly cry "Foul!" when an opponent or an industrious reporter attempts to demonstrate the contrary. Any test adequate to safeguard First Amendment guarantees in this area must go far beyond the customary meaning of the phrase "official conduct."
Monitor Patriot Co. v. Roy, 401 U.S. 265, 274, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971) (footnote omitted).
[2] Cf. Citizens Against Rent Control/Coalition for Fair Hous. v. City of Berkeley, 454 U.S. 290, 297-98, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) (drawing a distinction for First Amendment purposes between candidates' election campaigns and ballot measure campaigns; First Amendment standard for core political speech prohibits the states from limiting the dollar amounts of contributions for and against ballot measures in order to "equalize" the information presented on both sides, unlike the situation where the governmental interest in avoiding danger of corrupt officeholders is sufficient to justify limits on contributions to a candidate's election).
[1] Brown v. Hartlage, 456 U.S. 45, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982), struck down a Kentucky statute purporting to punish innocent but mistaken assertions of facts.
[2] See Treasurer of the Comm. to Elect Gerald D. Lostracco v. Fox, 150 Mich.App. 617, 389 N.W.2d 446 (1986) (affirming injunction against candidate for judgeship who falsely claimed in campaign literature he was the incumbent, holding "[k]nowing misrepresentations are not constitutionally protected free speech.").
[3] McIntyre, 514 U.S. at 350-51, 115 S.Ct. at 1521. For example, Ohio Revised Code Annotated § 3599.09.2(B) (1988) provides:

No person, during the course of any campaign in advocacy of or in the opposition to the adoption of any ballot proposition or issue, by means of campaign material, including sample ballots, an advertisement on radio or television or in a newspaper or periodical, a public speech, a press release, or otherwise, shall knowingly and with intent to affect the outcome of such campaign do any of the following:
(1) Falsely identify the source of a statement, issue statements under the name of another person without authorization, or falsely state the endorsement of or opposition to a ballot proposition or issue by a person or publication;
(2) Post, publish, circulate, distribute, or otherwise disseminate, a false statement, either knowing the same to be false or acting with reckless disregard of whether it was false or not, that is designed to promote the adoption or defeat of any ballot proposition or issue.
See Pestrak v. Ohio Elections Comm'n, 926 F.2d 573 (6th Cir.1991) (court upheld Ohio Rev.Code § 3599.091(B)(1) which proscribes false statements in campaigns involving candidates if false statement was made knowingly or with reckless disregard as to its falsity; statute was not unconstitutional on its face).
[4] Then-Professor Bogen aptly and eloquently illuminated the constitutional difference between a mistake of fact and a deliberate lie:

[U]nless innocent falsehoods are protected, valid criticisms of governmental conduct may be stifled. The calculated falsehood, however, needs no such protection. As long as the populace is aware that it is the calculation and not the falsity that exposes one to punishment, the innocent speaker will not be deterred from saying what he believes to be true. The Court need focus only on the knowledge of the speaker and not on the truth of his statement, or the quality of his ideas. Again the Court is concerned with the elimination of an evil by means which are not directed to the content of the words.
David S. Bogen, The Supreme Court's Interpretation of the Guarantee of Freedom of Speech, 35 MD. L. REV. 555, 605-06 (1976) (footnote omitted).
[5] The majority's disapproval of RCW 42.17.530(1)(a) goes further than its analysis warrants. The majority's analysis recognizes two different situationsthe first, where candidates are involved, implicating defamation concerns, and the second, where only ballot issues are involved, and defamation is not an issue. It is not clear at all from the majority's analysis that the statute should be unconstitutional under the first circumstance. Indeed, insofar as the statute tracks the New York Times test, it plainly cannot be unconstitutional. At most, then, the majority's reasoning supports a holding of unconstitutionality only when ballot issues are involved, yet the majority strikes down the statute in its entirety.
[6] Madison referred to "the vicious arts, by which elections are too often carried." THE FEDERALIST NO. 10, at 63 (James Madison) (Jacob E. Cooke ed., 1961).
[7] In a 1988 campaign for the State House of Representatives, for example, the successful candidate sent out a mailing over the last weekend of the campaign against his opponent, a former Superintendent of Public Instruction, implying that his opponent had "something to hide" in his refusal to remove licenses of teachers investigated for illicit relations with students.
[8] These statutory prohibitions were the result of a 1984 campaign in Snohomish County when a candidate for the Legislature falsely distributed political advertising implying that the Everett Herald had endorsed him for office when in fact the Herald had endorsed his opponent. 1985 House Journal, Reg. Sess. at 78-80.
[9] My analysis of the facial constitutionality of RCW 42.17.530 does not mean that an appropriate challenge to its constitutionality as applied, in light of the First Amendment protection to political speech, may not be successful. An as-applied challenge is a very valuable deterrent to excessive activities in campaigns by the Public Disclosure Commission or the use of allegations of violation of RCW 42.17.530 as a campaign tactic.
[10] As the Court of Appeals noted in Hoppe, an expression of opinion can be defamatory if defamatory facts are the opinion's basis. Hoppe, 53 Wash.App. at 671, 770 P.2d 203. For example, a person could not avoid the reach of RCW 42.17.530 by asserting "I believe all proponents of Initiative X are criminals." See Milkovich v. Lorain Journal Co., 497 U.S. 1, 19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) ("Simply couching a statement'Jones is a liar'in terms of opinion'In my opinion Jones is a liar'does not dispel the factual implications contained in the statement").
[11] Notwithstanding the wide latitude given to political speech in the campaign context, I do confess some concern at the timing of the distribution of the leaflet at issue in this case. One million copies of the leaflet were distributed by the Committee over the weekend before the election. In the real world of political campaigns, there was no possibility whatsoever that the opponents of the Committee could prepare a responsive leaflet, prepare a direct mail response, or purchase newspaper, radio, or TV time sufficient to respond to any statements contained in the leaflet, even if they were outright falsehoods as contemplated by RCW 42.17.530.
[12] Wisconsin's current version of the statute is little changed from 1938 and reads: "No person may knowingly make or publish, or cause to be made or published, a false representation pertaining to a candidate or referendum which is intended or tends to affect voting at an election." WIS. STAT. ANN. § 12.05 (West 1996).