[No. 40004-5-I.   Division One.   October 4, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. JEREMIAH DANIEL HARRIS, *Appellant*.

---

*Oliver Ross Davis*, for appellant.
*James H. Krider, Prosecuting Attorney*, for respondent.

AGID, J. — Jeremiah Harris is a deaf man who pleaded guilty to a sex offense. He was given a Special Sexual Offender Sentencing Alternative (SSOSA), but later violated conditions of that sentence. Ultimately, the court revoked his suspended sentence. Harris argues that the court's failure to provide a signing interpreter during meetings with his probation officer violated both a state statute and his right to due process. Because the statute requiring an interpreter at certain court-ordered probation meetings is unconstitutional and Harris's probation meetings comported with due process, we affirm.

## FACTS

Harris pleaded guilty to one count of Child Molestation in the First Degree on August 10, 1994. At the plea hearing, the court provided a signing interpreter for him.[1] On November 16, 1994, the court imposed a SSOSA, suspending his standard range sentence on the condition that he participate in sexual deviancy treatment, have alcohol and drug testing through TASC,[2] and maintain employment or attend a job training program. Harris signed the judgment and sentence, indicating he understood its terms.

After sentencing, Dr. Brenda Townes did a neuropsychological evaluation of Harris. Harris can read lips, sign language and written material, but a signing interpreter assisted during the evaluation even though most of the test was given in written form. The tests established intelligence in the normal range, with reading and math skills at the fourth or fifth grade level. He had graduated from high school and held three separate jobs, the longest for four months, at a restaurant, Safeway, and Pizza Hut. At the time of the evaluation, Harris was in sexual deviancy

[1]Harris was born with German measles and has been deaf his entire life.

[2]Treatment Alternatives to Street Crime.

therapy with Judith McAllister and TASC therapist Vickie Decker.

## First Probation Violation Hearing

On December 29, 1995, the court held a probation violation hearing on allegations that Harris failed "to make satisfactory progress in Sexual Deviancy Treatment" and failed "to maintain employment, a training program, or other productive activities as required by the Community Corrections Officer." A signing interpreter was present to assist Harris at the hearing.

At the hearing, Community Corrections Officer (CCO) Lynne McIlraith testified that she first met with Harris in the Snohomish County Jail to explain the conditions of supervision. Thereafter, she took steps to ensure that Harris knew what was expected of him while he was on probation:

> When Jeremy comes in, I always tell him when the next report day is. Either I have him write it down or stress that it's the first two Tuesdays to report. I again go over when I'm going to be there to his home, and to be available for me at that time.
>
> I've gone over the Judgment and Sentence with him numerous times; explained his requirements, the requirements of the Court . . . It's a constant reaffirming of his rules and regulations.

McIlraith said she took these steps because she knew Harris was hearing impaired. She felt that they were able to communicate somewhat effectively. The court hearing was the first time she had communicated with Harris using an interpreter, and she agreed communication was "a lot easier."

McIlraith testified that Harris signed a sexual deviancy treatment contract with McAllister on October 13, 1994, "indicating he understood the requirements of treatment." McAllister reported to McIlraith that Harris missed an ap-

pointment and sent Harris a letter stating that he would be suspended from treatment if he missed a second one. After Harris missed a second appointment, McAllister suspended him on October 5, 1995.

CCO McIlraith also testified that at their July 13, 1995 meeting, Harris told McIlraith that he had quit his job. When asked, he "could not give me a reason other than he just did not want to work." McIlraith again went over the conditions of supervision with Harris, and he "stated he understood" the work-related condition. At their September 5, 1995 meeting, McIlraith asked Harris to name four businesses that he had applied to for work. McIlraith said he "presented himself as a victim and said, *'I can't do much because I'm deaf '.*" He failed to report on the next reporting day.

Harris testified that after he had consulted with his lawyer, he knew that he "needed to follow all of the rules; if I didn't follow all the rules, then I would be put in prison." Harris admitted that McIlraith had explained all of the rules governing his conduct, but "sometimes I didn't follow them." Based on this evidence, the court found that Harris willfully committed the violations and imposed 60 days in jail.

## Second Probation Violation Hearing

On March 20, 1996, McIlraith filed a second violation report, alleging that Harris failed to attend substance abuse monitoring appointments at TASC on three occasions and failed to maintain his employment or job training. The court again held a revocation hearing at which McIlraith testified that, in order to communicate with Harris, they wrote notes to each other when he came in for his probation meetings. McIlraith was certain that he understood what she was saying because of the content of his responses. Harris never requested an interpreter.

In their weekly contacts, McIlraith reminded Harris of his employment, job training and TASC testing responsibil-

ities.[3] She knew he understood the TASC requirement because "he followed the direction to go, he went through the evaluation process . . . . He was able to make [his] appointments on a regular basis to TASC." When Harris was released from jail on the probation violation, McIlraith told him to contact TASC and begin testing again. He did not keep his appointments at TASC on March 5, 13 or 14, 1996 and explained he hadn't gone because he either overslept, didn't want to go, or forgot.

McIlraith reported that after Harris was released from jail, he contacted his employer, Jim Wilde of Quality Industrial Services (QIS). Harris's starting date at QIS was February 25, 1996. On February 28, 1996, Wilde called McIlraith and told her that Harris had not appeared for work. McIlraith contacted him, and met the following day with him and Wilde. Wilde explained the importance of regular, timely attendance as an employee, described call-in procedures should Harris become ill, and warned that repeated calls about illness would not be acceptable. On March 13, 1996, Wilde told McIlraith he had fired Harris because he never actually came in to work.

McIlraith thought Harris understood the rules discussed at the meeting because he reads lips and Wilde knows and used American Sign Language when talking with Harris. McIlraith said that when she met with Harris on March 19, 1996, he did not seem to care that he had lost a job. He claimed that "he wasn't motivated and that he was fighting with his girlfriend and there were a lot of things going on in his life that prevented him from working." Harris did not say whether he had applied or gotten another job.

The court modified Harris's conditions of probation by striking the employment requirement. It also gave him one month to enroll in a certified sexual deviancy program but warned him that if he violated his probation again, the court would revoke his SSOSA. After finding Harris had willfully failed to comply with the conditions of his

[3]McIlraith also contacted Harris by phone. Harris has TTY equipment that enables him to take calls.

sentence, the judge deferred decision on whether to revoke the SSOSA until after Harris tried to obtain sexual deviancy treatment. When he later failed to obtain treatment, the court revoked his SSOSA, noting:

> I have no treatment program for this person, due primarily to the fact that he got himself kicked out of the treatment program, not lack of funding. Since then, attempting to seek other treatment programs willing to take him[, those] treatment programs contacted have indicated they would not [take him], given his having been terminated, so to speak, from the previous provider. . . .

The court gave three reasons for the revocation: his failure to maintain employment, attend substance abuse monitoring, or obtain sexual deviancy treatment.

## DISCUSSION

RCW 2.42.120(3) requires that, when a hearing impaired defendant

> participates in a program or activity ordered by a court as part of the sentence . . . or required as a condition of probation or parole, the appointing authority shall appoint and pay for a qualified interpreter to interpret exchange of information during the program or activity.

The sentencing court did not appoint an interpreter to be at Harris's meetings with McIlraith. Harris argues that this violated both the statute and his right to due process. The State responds that RCW 2.42.120(3) is unconstitutional, and, in any event, Harris's due process rights were not violated because he received notice of and understood what conduct was required of him. We agree.

■■ We review constitutional challenges to a statute de novo.[4] Article II, section 19 of the Washington Constitution provides that "[n]o bill shall embrace more than one

[4]*State ex rel. Public Disclosure Comm'n v. 119 Vote No! Comm.*, 135 Wn.2d 618, 623, 957 P.2d 691 (1998).

subject, and that shall be expressed in the title." The purposes of article II, section 19 are to "(1) prevent 'logrolling,' or pushing legislation through by attaching it to other necessary or desirable legislation, and (2) assure that the members of the legislature and the public are generally aware of what is contained in proposed new laws."[5] RCW 2.42.120 was passed as a section of chapter 389, LAWS OF 1985, the title of which reads:

## COURT COSTS—COLLECTION AND REMITTANCE

AN ACT Relating to court costs; amending RCW 10.01.160, 27.24.070, 3.46.120, 3.50.100, 3.62.010, 3.62.040, 10.82.070, 35.20.220, 36.18.025, and 2.42.050; adding new sections to chapter 2.42 RCW; providing an effective date; and declaring an emergency.[6]

The Washington Supreme Court recently considered a challenge to the constitutionality of RCW 2.42.120(4) and (5), two other sections of the interpreter amendments.[7] Like the section challenged here, they were enacted as last-minute amendments to chapter 389 to add provisions

---

[5]*State v. Thorne*, 129 Wn.2d 736, 757, 921 P.2d 514 (1996).

[6]LAWS OF 1985, ch. 389, at 1618.

[7]Those amendments provide:

"(4) If a law enforcement agency conducts a criminal investigation involving the interviewing of a hearing impaired person, whether as a victim, witness, or suspect, the appointing authority shall appoint and pay for a qualified interpreter throughout the investigation. Whenever a law enforcement agency conducts a criminal investigation involving the interviewing of a minor child whose parent, guardian, or custodian is hearing impaired, whether as a victim, witness, or suspect, the appointing authority shall appoint and pay for a qualified interpreter throughout the investigation. No employee of the law enforcement agency who has responsibilities other than interpreting may be appointed as the qualified interpreter.

"(5) If a hearing impaired person is arrested for an alleged violation of a criminal law the arresting officer or the officer's supervisor shall, at the earliest possible time, procure and arrange payment for a qualified interpreter for any notification of rights, warning, interrogation, or taking of a statement. No employee of the law enforcement agency who has responsibilities other than interpreting may be appointed as the qualified interpreter."

requiring signing interpreters.[8] The *Patrice* court concluded that the title of the bill, "AN ACT Relating to court costs," did not give notice to the public or to the Legislature that the act also contained laws requiring signing interpreters for criminal suspects. Because the inadequate notice violates article II, section 19 of the Washington Constitution, the court held the statutes unconstitutional.[9]

█ RCW 2.42.120(3) suffers from the same infirmity as the sections the court held invalid in *Patrice*. Nothing in the title of chapter 389, "AN ACT Relating to court costs," gave notice to the Legislature or the public that the Act pertained to providing signing interpreters for persons convicted of crimes. RCW 2.42.120(3). Court costs have nothing to do with the statute's requirement that trial courts appoint signing interpreters to defendants required to participate in programs as conditions of either a sentence or probation. RCW 2.42.120(3) therefore also violates article II, section 19 and is unconstitutional.[10]

█ Harris argues that his constitutional due process rights were violated when no interpreter participated in his meetings with McIlraith. We can't agree. Harris is able to read and his intelligence is normal, and he did graduate from high school. But these characteristics aside, Harris's own actions in complying with the conditions of his SSOSA defeat his argument that without an interpreter he did not have adequate notice of what he was required to do.

Initially, Harris complied with the SSOSA conditions. He met somewhat regularly with his CCO, McIlraith, went to TASC for breath tests and/or urinalysis, and went to his sexual deviancy treatment meetings with McAllister after signing a treatment contract. Similarly, his behavior at QIS

---

[8]*Patrice v. Murphy*, 136 Wn.2d 845, 855, 966 P.2d 1271 (1998).

[9]*Patrice v. Murphy*, 136 Wn.2d 845, 852-54, 966 P.2d 1271 (1998).

[10]The parties requested and were granted a stay in this case pending the Supreme Court's resolution of *Patrice*. In their motions to rescind the stay, the parties acknowledged that we were likely to hold that RCW 2.42.120(3) was unconstitutional. They agreed that the remaining issue is whether the absence of an interpreter at probation meetings violates due process.

demonstrates that he understood what was required of him. After his meeting with McIlraith and Wilde, Harris followed the QIS procedures they explained to him the first five times he was absent from the job. He clearly understood them. If not, he would not have followed them. He also obtained employment and reported to his CCO when he lost his job, both conditions of his supervision. Indeed, Harris admitted at the December 29 hearing that McIlraith had explained these rules to him, but "sometimes I didn't follow them."

McIlraith also took care to assure that Harris understood what conduct was required while on probation. Although Harris read lips, McIlraith wrote out most of their communications. If she was not sure he had understood what she had told him, she kept trying until she was certain that Harris "was, in fact, getting it." The record is replete with examples of the care Harris's CCO and employer took to ensure that Harris knew not only what was expected of him, but the result should he fail to meet his responsibilities. Harris had notice of clear guidelines for his conduct.

Harris argues that he could not have received notice simply because no interpreter was present. But he does not explain, nor does the record elucidate, how having an interpreter would have provided him with notice of anything other than what McIlraith had already told him. While it may be true in the abstract that Harris's "ability to understand" the CCO's directions could have been enhanced by the presence of an interpreter, his own actions and admissions at the revocation hearings demonstrate that he knew exactly what he was supposed to do to comply with his SSOSA conditions. There was no due process violation.

Affirmed.

KENNEDY, C.J., and GROSSE, J., concur.